751 A.2d 40

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT AND CROSS–APPELLANT, v. PETER PAPASAVVAS, DEFEN-DANT–APPELLANT AND CROSS–RESPONDENT.

Argued November 30, 1999—Decided May 16, 2000.

566

572

574

*James K. Smith, Jr.,* and *Cecelia Urban,* Assistant Deputy Public Defenders, argued the cause for appellant and cross-respondent (*Ivelisse Torres,* Public Defender, attorney).

*Marcy H. Speiser,* Deputy Attorney General, argued the cause for respondent and cross-appellant (*John J. Farmer, Jr.,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

O'HERN, J.

In this capital case a jury has convicted defendant of murder and recommended that he be sentenced to death. Defendant contends that he was denied a fair trial. The major contentions in his appeal are that (1) the jury selection process (the *voir dire* ) was so inadequate that it violated defendant's constitutional rights to a fair trial; (2) that the trial court failed to excuse three jurors whose views in favor of the death penalty substantially interfered with the performance of their duties as jurors; (3) that, conversely, the trial court excused one juror who had reservations about the death penalty but not such opposition to the death penalty that it would interfere with the performance of his duties as a juror; (4) that in mid-trial the court changed the order of exercise of peremptory challenges; (5) that the court granted an extra peremptory challenge to the State without awarding an additional challenge to defendant; (6) that the State's medical examiner was permitted to express a vague and conclusory opinion that the "assault" on the victim and not an accidental fall had caused her death; (7) that a State psychiatrist expressed an opinion on the guilt of defendant, contrary to our holding in *State v. Odom,* 116 *N.J.* 65, 560 *A.*2d 1198 (1989). We find that the measures taken by the trial court sufficiently ensured that a fair and impartial jury was chosen and that evidentiary rulings did not deny defendant a fair trial. We find no other errors that tainted the trial. We

affirm the convictions of murder and of other crimes and affirm the sentence of death. Proportionality review will take place in later proceedings.

I.

On April 25, 1996, defendant broke into the home of Mildred Place who lived alone at 11 West Henry Place in Iselin. She was then age sixty-four. Defendant was fleeing from the police, who had come to his nearby home in order to question him about an unrelated matter. He and the other members of his family were in a distraught state because a brother of defendant had attempted suicide. In his hurry, defendant left dressed only in his underclothing. He hid in the basement of the victim's house, which is located four blocks from Papasavvas's residence. When Mrs. Place came home, he did not at first confront her. She spoke on the telephone at about 10:00 p.m. with a friend. The conversation lasted about fifteen minutes.

Some time thereafter, the fatal encounter took place. Because there were no witnesses to the attack, there was no direct evidence of the precise manner in which the death occurred. There was evidence of bizarre and repulsive conduct by defendant such as "very straight [scissor] cuts" of her clothing, leaving exposed her private parts. This cutting was concededly done when the victim was motionless.

The State infers that Papasavvas attacked Mrs. Place so that he could escape capture by preventing her from calling the police. Whatever may have been his motive, defendant left a trail of incriminating evidence. At 11:15 p.m., he called his home, leaving a record of that call on Mrs. Place's telephone bill. He stole her car and partied in New York with a girlfriend, using Mrs. Place's credit cards.

A Middlesex County grand jury indicted defendant for murder, robbery, aggravated sexual assault, burglary, and other offenses. The State informed defendant that it would seek the death-penalty and establish as aggravating factors c(4)(c) (torture or depravity),

c(4)(f) (escape detection), and c(4)(g) (felony murder).[1] Before trial, the court granted defendant's motion to strike the c(4)(c) aggravating factor. Given the overwhelming evidence of his involvement in the killing, defendant sought to show that he lacked the intent or purpose to kill.

According to defendant,[2] he planned to hide in the basement until Mrs. Place went to bed, when he planned to leave the home quietly. Mrs. Place foiled those plans when she opened the basement door and found defendant, who was still wearing only his underwear. Attempting to escape without allowing her to inform anyone that he had broken into her home but without severely injuring her, defendant put his hands around her neck, in what he described as a "sleeper hold," in order to induce unconsciousness. After the sleeper hold caused her to pass out, Mrs. Place fell down the cellar stairs. While falling down the stairs, Mrs. Place broke her neck, a severe injury that may have caused her death.

Believing that Mrs. Place was feigning death, defendant said that he attempted to place a gag in her mouth so she would stop pretending she was dead but be unable to make noise. This gag was a belt that defendant retrieved from Mrs. Place's raincoat. The belt, which the State medical examiner referred to as a ligature, impeded Mrs. Place's breathing because it pushed her tongue to the side. When she remained motionless, defendant, hoping to frighten her into getting up, threatened to sexually

[1] For convenience, we omit the complete citations to the aggravating factors, *N.J.S.A.* 2C:11–3c(4)(c),(f), and (g), and the complete citations to the related mitigating factors.

[2] Defendant's version of events was admitted into evidence through the testimony of Dr. Arnaldo Apolito, a psychiatrist who testified for the defense, and Dr. Stanley L. Portnow, a psychiatrist who testified for the State. Both psychiatrists had examined defendant. The testimony was admitted to show the basis for the experts' opinions. It was not admissible to prove the truth of the matters asserted.

assault her if she did not comply. Sexual contact was evidenced by sperm found on Mrs. Place's body during the autopsy.

A forensic pathologist, testifying for the defense, expressed the opinion that constriction of the neck and the broken neck should both have been listed as causes of death because he could not state to a reasonable degree of medical certainty that either trauma alone caused Mrs. Place's death.

Concerning defendant's mental state, the defense presented expert testimony from a clinical neuropsychologist and a psychiatrist. These witnesses described his prior life. He was born in Livingston, New Jersey on June 14, 1972. His parents were immigrants. He was one of four children. Violence filled the Papasavvas household. Defendant's father abused defendant and his two older brothers. When he thought that his sons were misbehaving, he would take them downstairs, strip them, tie them to a lally column, and beat them with a belt or stick. He took nude photos of them. He beat defendant's mother, Fotini. He even beat the family's pets.

In search of acceptance, defendant fell in with bad companions, engaging in truancy, and shoplifting. He began to abuse alcohol and drugs, including marijuana and cocaine. In school, he was classified as emotionally disturbed. Minor stresses made him irritable, angry, and occasionally aggressive.

In 1989, when he was seventeen-years-old, he received court-ordered in-patient psychiatric counseling at the Carrier Clinic, where he was hospitalized for twenty days. He suffered from insomnia, flashbacks, hallucinations, and suicidal thoughts. In 1992, he was struck in the head and suffered a concussion.

That incident foreshadowed a more serious head injury defendant suffered during a motorcycle accident in 1993. He was in a coma for almost three weeks. A CT scan revealed that defendant had bilateral frontal traumatic subdural hygromas, a diagnosis suggesting that defendant had a fluid buildup in both frontal lobes, the portion of the brain needed for high-level reasoning, judgment,

and decision-making. The frontal lobes also control one's personality. The injury significantly impaired defendant's planning, problem solving, and strategy formation. The severe head injury greatly exacerbated defendant's existing impediments in insight and judgment.

Defendant's personality changed after the accident in 1993. In July 1994, defendant pulled a knife on a girlfriend. His drinking escalated. His criminal activity intensified.

A defense psychiatrist testified that defendant's motorcycle accident caused him to suffer severe organic brain syndrome, a form of brain damage. According to the psychiatrist, this organic brain disorder prevented him from acting purposefully or knowingly during his deadly encounter with Mrs. Place. This doctor believed that defendant could not know the nature and quality of his acts or differentiate between right and wrong.

In rebuttal, the State offered evidence from a psychologist and a psychiatrist. The psychiatrist, Dr. Stanley Portnow, diagnosed defendant as having at most an antisocial personality disorder and a substance dependence problem. Dr. Portnow did not believe that defendant suffered from a major mental disorder or disease.

The jury convicted defendant of murder, felony murder, burglary, robbery, auto theft, and credit-card theft. The jury acquitted him of aggravated criminal sexual assault but convicted him of aggravated criminal sexual contact, a lesser-included offense. This latter offense was not a felony-murder predicate.

Before the penalty phase, defendant served the State with a notice of mitigating factors. Defendant informed the State that he would seek to establish the c(5)(a) (extreme emotional disturbance), c(5)(c)(age), c(5)(d) (diminished capacity), and c(5)(h) (the catch-all) mitigating factors. Defendant's abused childhood was the recurring theme of the catch-all factors defendant delineated. The penalty phase commenced before the court and the jury that had convicted defendant. Concluding that defendant had not introduced character evidence, the trial court granted defendant's

motion to preclude the State from introducing victim-impact evidence.

In the penalty phase, the State relied entirely on the evidence presented at the guilt phase to establish that defendant murdered Mrs. Place during the commission of a burglary and to escape detection for committing those crimes. Defendant relied on the psychiatric evidence offered at trial and additional lay testimony. An aunt, who was often present while defendant's father abused him, described how she could not go into the basement because she could not bear to watch the torture. She observed defendant's father humiliate his sons by causing them to walk around naked. The aunt saw the father use pinch pliers on his sons' toes or legs until they cried. She saw defendant left alone in puddles of urine.

Defendant's brother, Manny, and defendant's mother, Fotini, who was gravely ill with cancer, pleaded to the jury not to sentence defendant to death. In his allocution, defendant apologized for killing Mrs. Place and pleaded for his life.

Finding that defendant had murdered Mrs. Place during the commission of burglary and robbery, the jury unanimously concluded that the State had established the c(4)(g) (felony murder) aggravating factor. Five of the twelve jurors found the c(4)(f) (escape detection) factor. Three jurors found the c(5)(a) (extreme emotional disturbance) mitigating factor. The jury unanimously rejected the c(5)(c)(age) and c(5)(d) (diminished capacity) factors. Concerning the c(5)(h) (catch-all) factors, ten jurors found that defendant was subject to cruelty as a young child, all twelve found that defendant's school system classified him as emotionally disturbed, seven found that his emotional disturbance was at least partly due to cruelty he had experienced as a child, all twelve found that he suffered from a mental defect, disorder, or other mental disturbance, two found an undesignated factor that warranted mercy. All twelve rejected the other proposed catch-all factors. The jury unanimously determined that the felony-murder aggravating factor outweighed the mitigating factors beyond a

reasonable doubt. The trial court imposed the sentence of death and additional sentences on the noncapital offenses. Defendant appealed to us of right under *Rule* 2:2–1(a).

## II.

### *Pretrial Issues*

### 1. OVERALL ADEQUACY OF *VOIR DIRE*

Defendant asserts that the trial court conducted the death-qualification process in an inadequate manner. According to defendant, the *voir dire* failed to reveal prospective jurors' views on the death penalty and their ability to disregard their biases and follow the law. Consequently, court and counsel did not have sufficient information on which to determine whether prospective jurors were death-qualified, and defense counsel were unable to exercise their twenty peremptory challenges intelligently.

#### A.

Specifically, defendant argues that the court failed to educate the jurors on the provisions of the death penalty act and did not explain which murders are death-eligible. As a result, potential jurors did not understand the distinction between death-eligible and non-death-eligible homicides. Furthermore, the court failed to correct prospective jurors when they indicated misconceptions regarding the law. The court also neglected to ask jurors whether the applicable aggravating factors would cause them to vote automatically for a death sentence. In addition, the court failed to pose appropriate follow-up questions to potential jurors who expressed an unwillingness to consider defendant's mitigating evidence. Finally, the court often asked closed-ended questions that suggested an answer.

#### B.

*State v. Williams*, 93 *N.J.* 39, 459 *A.*2d 641 (1983)(*Williams I*), and *State v. Williams*, 113 *N.J.* 393, 550 *A.*2d 1172 (1988)

(*Williams II* ), are the primers for the conduct of *voir dire* in capital cases. We simply repeat the salient points emphasized in those cases.

▇▇▇ It is axiomatic that an impartial jury is a necessary condition to a fair trial. "This requirement of fairness—and particularly jury impartiality—is heightened in cases in which the defendant faces death." *Williams I, supra,* 93 *N.J.* at 61, 459 *A.*2d 641.

▇▇▇ In order to insure the impartiality of the jury, we have emphasized the critical importance of the *voir dire* in exposing potential and latent bias. Under our single jury capital trial system, jury selection must serve double duty as a time to death qualify jurors and to enable counsel to exercise the valuable constitutional prerogative of selecting a fair and impartial jury. In that dual setting, *voir dire* acts as a discovery tool. It should be like a conversation in which, without manipulation or delay of trial, the parties are able to discern the source of attitudes that would substantially interfere with the jurors' ability to follow the law. In order for this discovery procedure to be effective, potential jurors must have a full comprehension of their legal duties. In *Williams II,* the Court wrote:

> [T]he trial court [should] provide[ ] the jurors with an outline of the State's death penalty statute.
>
> Knowledge about what constitutes capital murder, the bifurcated proceeding that separates the guilt and penalty phases, and the use of the "aggravating and mitigating factors" scheme during sentencing will enable all potential jurors to answer questions concerning the death penalty free of misconceptions and faulty assumptions concerning how the law is administered in this state. Additionally, this type of instruction will provide all jurors with a common base of information from which to answer questions, removing any difference between jurors based on knowledge of law.
>
> . . .
>
> [W]e believe that providing jurors with a concrete and accurate view of the death penalty in New Jersey will enable them to answer questions concerning their attitudes about the death penalty based on an accurate portrayal of what the law is, and thus put the juror in a position to answer questions free of mistaken notions

concerning the law, which appeared to be so prevalent on review of the transcripts of this *voir dire* and so many others.

[*Williams II, supra,* 113 *N.J.* at 412–13 n. 5, 550 *A.*2d 1172 (citation omitted).]

 We have disapproved close-ended questions that predetermine answers or elicit narrow "yes" and "no" responses. *Williams II, supra,* 113 *N.J.* at 423, 550 *A.*2d 1172. We have encouraged the formulation of additional questions that will provide insight into a juror's views on the controversy. Obviously, a court must control *voir dire* examination, but in doing so it must remain neutral. The court must not proselytize; it must not indicate its views of the "right" or "wrong" answers to *voir dire* questioning. The *voir dire* should be probing, extensive, fair and balanced.

It is against these standards that we measure the *voir dire* in this case.

## C.

The court substantially accomplished the purposes of *voir dire,* however a number of problems arose. The court might better have educated the jurors initially about the capital-sentencing scheme in the context of this case involving the potential aggravating factors of rape, robbery, and burglary. The court failed to define which murders were death-eligible and neglected to correct misconceptions regarding these issues. However, the trial court was extremely open to allowing significant inquiry into a juror's feelings, views, and attitudes about the case. It allowed attorneys to conduct substantial portions of the *voir dire* with a single requirement that the attorneys attempt not to repeat the questions that the court had already asked. The court did not fall into the error of *Williams II, id.* at 416, 550 *A.*2d 1172, in which the court flatly refused counsel's request to ask jurors if they thought that the death penalty should automatically apply to someone who was found guilty of a knowing and purposeful murder in the course of rape, or the error of *State v. Moore,* 122 *N.J.* 420, 446–48, 585 *A.*2d 864 (1991), in which the court refused to ask whether

a juror would automatically apply the death penalty when a child was killed. Previous courts had resisted such questioning on the thesis that it would preview the jurors' ultimate verdict. But we have emphasized that counsel must know in such cases whether a juror is willing to follow the bifurcated procedure of the statute and consider mitigating evidence that might result in a life sentence even in such cases. The trial court was quite open to all such questions posed by counsel in this case. With that as background, we shall briefly describe the conduct of the *voir dire*.

## D.

When speaking to the first group of forty-five potential jurors, the court explained:

The first charge is murder in the first degree. That particular charge could result in the death penalty. If you determine as judges [of the facts] that [defendant] is guilty of that particular crime as it will be defined for you, that is a purposeful and knowing murder by his own conduct or that he purposefully or knowingly by his own conduct inflicted serious bodily injury upon Mildred Place which resulted in her death, if you find him guilty of that charge then there will be a second phase to this trial. That will be the penalty phase.

The court added:

[I]f you find him guilty of that murder charge then, of course, there will be a second phase to the trial and the prosecution and the attorneys will present to you what are known as aggravating factors and mitigating factors and then you will have to decide, and again I will explain all of the law involved to you at a later date, you would then have to decide whether the State has proven to your satisfaction beyond a reasonable doubt the existence of an aggravating factor, and then, of course, you have to decide whether there are mitigating factors. You would have to weigh the mitigating factors and the aggravating factors in making a decision as to what the proper penalty would be.

Before they were questioned, each of the prospective jurors had completed a detailed questionnaire containing sixty questions that explored potential sources of bias or disqualification.

During *voir dire*, the court questioned each juror first. After it completed its questioning, the court then allowed counsel to question each juror. The defense almost always questioned each juror. The prosecution also often took advantage of the opportu-

nity to question potential jurors, and co-counsel for the defense often added questions.

After completing the *voir dire* of the first group of jurors, the court instructed another group of prospective jurors. These preliminary instructions lacked the detail of its earlier instructions. The court described the charges as "murder in the first-degree, death-eligible," for which the jury "would have to determine the sentence of death or thirty years imprisonment." The court explained that felony murder was not death-eligible and that if it found defendant death-eligible, the jury "would move to the second phase of the trial." In addressing a third panel, the court described the case as involving "murder in the first-degree, death-eligible."

Defendant complains that when asked which murders they believed warranted a life sentence, several potential jurors answered "accidental murders." In most instances, the court did not explain to these jurors that an accidental homicide was not death-eligible. Defendant also complains that the court did not inform the prospective jurors which aggravating factors the State sought to establish and asked very few prospective jurors if they could be impartial during the penalty phase if they convicted defendant of murder and aggravated sexual assault. Some jurors were asked:

> [W]ould you tend after the penalty phase, would you tend to be in favor of the death penalty? Would you be in favor of the life imprisonment with minimum thirty years of incarceration or would you be not inclined to do anything until you heard everything that [is involved] . . .

However, this was the exception, not the rule. On the other hand, the court had instructed the jurors that defendant was being charged with aggravated sexual assault, burglary, and robbery, and the jurors had been asked in the detailed questionnaire whether the nature of the charges against defendant would impair their ability to be impartial.

■ Although it is the non-delegable responsibility of a court to ensure that a fair and impartial jury is seated, *Williams II, supra,* 113 *N.J.* at 409, 550 *A.*2d 1172, this does not mean that a

reviewing court may not take into account the role that counsel has played in ensuring that end.

For example, defense counsel often asked jurors whether they could be impartial at the penalty phase after finding defendant guilty of murder and aggravated sexual assault. The defense posed that question to Juror Reagan, who replied:

A: I really can't say yes or no to that. I guess it would have to depend on all
. . .

Q: The circumstances?
A. Right.

Another juror, Harmon, was asked:

Q. [W]hen [the court] told you that the charges are murder and aggravated sexual assault, and the other things, what was your gut reaction to that?

. . .

A: . . . I think of my little nieces or nephews or my Mom or, you know, my girlfriend or something like that. For some reason. It's just something I don't approve of, regardless of what happened, whether he was drunk or on drugs or whatever.

Q: Okay. Do you think you can put aside your strong feelings, against aggravated sexual assault, and listen to all the evidence, and be impartial and fair?

A: I would try. You know, like I told the Judge before, I think it will still stick in the back of my mind, so no, you know.

. . .

Q. [W]here would you be leaning, if you can say.
A: Maybe the death.

Q: Okay. With that same scenario, add in that, assume Mr. Papasavvas has organic brain damage, which happened as the result of a motor vehicle accident.

A: Okay. Uh-hum.

Q: Could you see yourself considering that physical injury as mitigating against the death penalty, and leading you, perhaps, to impose life in prison?

A: . . . [B]ut if this is something he just got, just got prior to committing this crime, then it is a little bit different. If this is something he knew he had, or his family knew he had, then they should have been taking care of that.

. . .

The prosecutor followed up:

Q: I think the important question is, would you listen to this kind of testimony?
A: Yeah, I would listen.

In short, there was every opportunity to explore the jurors' views. In *Williams II*, this Court held that the trial court, which did not permit any attorney-conducted *voir dire*, erred when it refused defense counsel's request to ask potential jurors whether they could consider mitigating evidence after convicting the defendant of rape and murder. *Id.* at 417, 550 *A.*2d 1172. This Court reasoned that "the failure to inquire into whether any juror could consider the mitigation evidence if it was established that defendant was guilty of rape and murder denied counsel and the trial court the tools with which to insure that the jury panel could fairly undertake its role in this case." *Ibid.* That did not happen here.

As noted, the trial court was extraordinarily tolerant of the fullest inquiry on the part of counsel. Together court and counsel accomplished a most thorough and searching *voir dire*. This *voir dire*, like so many others that we have reviewed, took on a rhythm of its own. The trial court fully achieved the conversational mode of inquiry that this Court has encouraged. The exchanges among the court, counsel and jurors were open, frank, sometimes humorous, but always revealing. Generally the questionnaire pointed the court to the key areas of concern. Would a juror tend to favor the State's witnesses; would a juror hesitate to believe in psychiatric testimony; did the juror's reading or listening habits betray a bias for or against the death penalty?

For example, one juror, when asked how he felt about psychiatric testimony, replied that he did not think so much of it but "My wife tells me that I should see a psychiatrist." Another was asked if she listened to a certain all New Jersey news radio station. She replied that the people who listened to that station "are so stupid you can't listen to that." Another person who listened to a "shock-jock" radio program was asked how she felt about "Baba Booie." One described the crime novelist Mary Higgins Clark as a favored author, another Langston Hughes as a favored poet, and one who watched the series Ally McBeal observed that "lawyers looked better on TV." In short, there was every opportunity to discern jurors' biases and attitudes in the context of this case.

Defense counsel was wisely prepared with a jury consultant who was often introduced to jurors and suggested lines of questioning. The pool of jurors appeared to be fair and balanced with no knowledge at all of the specifics of this case. The jurors brought a breadth of life experience into the courtroom. Poets, professors, and laborers were represented. Many jurors possessed a natural eloquence, often expressing views about the death penalty that matched the statutory scheme, viewing death as the appropriate penalty for "serial killers," those who imposed "additional cruelty," those who killed police officers, and those who were "thrill killers."

On balance, the *voir dire* was sufficiently probing to discover any potential bias and permit counsel to exercise peremptory challenges intelligently. *See State v. Harris*, 156 *N.J.* 122, 164, 716 *A.*2d 458 (1998) (upholding *voir dire* in which trial court informed potential jurors about capital-trial process and asked open-ended questions regarding their attitudes about capital punishment and inquired into their ability to follow law). Specifically, the court asked prospective jurors about their receptiveness to psychiatric testimony (through which most of defendant's mitigating evidence was ultimately introduced), their general views on the death penalty, whether their religious beliefs would interfere with their decision-making process, in which cases they would tend to impose the death penalty, in which cases they would tend to impose life imprisonment, whether their friends and relatives' views on capital punishment would influence them, and whether they could consider both sentencing options during penalty-phase deliberations. The court always permitted counsel to supplement its questions. The defense attorneys, whom a jury consultant assisted, often questioned prospective jurors regarding their impartiality in a case in which they would be asked to convict defendant of both murder and aggravated sexual assault. In addition, the trial court often asked each prospective juror, consistent with *Moore, supra*, 122 *N.J.* at 454, 489–90, 585 *A.*2d 864, about his or her ability to evaluate defendant's psychiatric defense.

Based on this *voir dire,* the court struck fifteen jurors for cause based on apparent biases concerning capital punishment. In addition, defendant and the State both exhausted their peremptory challenges, most of which were used to strike jurors who, although death-qualified, expressed views on capital punishment that seemed unfavorable to the striking party's interests.

■ The trial court did not employ a double standard in its death-qualification of prospective jurors. Rather, the court's decisions to qualify or disqualify potential jurors were fair and even-handed. The court qualified two jurors who indicated their willingness to disregard their anti-death-penalty views and follow the law. The trial court also death-qualified two jurors who both answered at the conclusion of their questioning, "I don't know" to whether they could impose the death penalty in this case.[3]

## 2. THE FAILURE TO EXCUSE DEATH–PRONE JURORS.

### A.

The first juror whom defendant unsuccessfully challenged for cause was Harry Applegate. After stating that "in general I believe in the death penalty," he added that for "you know, vicious types … [my] gut feeling is that … it is sometimes too good for some people." He complained that because of judicial delays, "the guy dies of old age" before the sentence is carried out. When asked whether the age of the victim would influence his judgment, he said:

> That's right at my mother's age. I don't know whether I can draw a clear line between the two. I think I would wind up, although I wouldn't tend to, associate some of that.

He repeated this concern in the context of viewing photographs:

> Q: And that would be to Mr. Papasavvas' detriment you think?
> A: Probably.

___
[3] The State used two of its peremptory challenges to remove these jurors from the jury.

The defense argued that Applegate could not assure the court that he would be impartial in view of the victim's age and that it was the prosecutor's later questions that had suggested the rehabilitating answer that Applegate could fairly judge the matter in spite of his feelings about his mother. After reviewing the transcripts, the court said:

> All right, my own, my own interpretation of the answers by this particular potential juror is that he would be brutally honest to a fault, and he obviously has a mom that's about the same age as the victim in this case or the alleged victim in this case, but he clearly stated he would look at the evidence and decide the case on the evidence and he would decide the death penalty issue on the evidence, one way or the other.

## B.

The next juror unsuccessfully challenged was Bette Shampaner. Asked for her reaction to a case involving the sexual assault and murder of a sixty-four-year-old woman, she described her reaction:

> Pretty lousy I think. It goes against me.

Asked if she could nonetheless consider in mitigation defendant's mental disturbance or childhood abuse:

> Well, actually we've had those kind of conversations in my office about dysfunctional upbringing and all that stuff and, you know, you can just use that to a certain point. That's it.

Her tendency, she admitted, heading into the penalty phase would be death. Defense counsel asked:

> Q: Do you think it would be hard for you to put aside your personal feelings about this abuse excuse type evidence in assessing the penalty in the case?
>
> A: No.

But when pressed, she acknowledged that for her,

> It's not an excuse.

Again, the prosecutor sought to rehabilitate her.

> Q: If you heard psychiatrists with two different points of view could you sit down and evaluate what they had said and decide how relevant either testimony was?
>
> A: Yeah. I would have to, you know, weigh both sides and see which I felt was more correct.

Asked if she would favor the State's psychiatrists over defendant's, she said:

> No, I'll try not to.

Asked if she would not always disregard a mental state defense, she said:

> A: Yeah. I'm not eliminating it total.
>
> Q. So you could evaluate and come to a conclusion.
>
> A: I would try.

The defense asked that Shampaner be removed for cause. The court responded:

> The lady obviously has some reservations as to some of the possible mitigating factors.... I did not hear her say that she would absolutely not listen to any of the testimony and not consider any of the testimony.... I believe that she would fairly and impartially listen to all of the testimony. That's not to say that she may not have some preconceived ideas when she walked into this courtroom, whether those will override my instructions and her ability to follow my instructions. It's very, very doubtful. I think she'd be a proper juror. I won't exclude her for cause. I'll qualify her.

### C.

The third juror unsuccessfully challenged was Ira Leslie. When asked about the death penalty, he answered:

> Well, I've got to be honest with you, Judge. I'm pretty conservative. I believe one life is no different than another life, a police officer or a young girl.

And later:

> Q: Does that statement that you just made, one eye, you were going to say an eye for an eye?
>
> A: Yeah.

After further questioning, the court asked,

> Q: So it's not strictly an eye for an eye?
>
> A: If you're in a bar and you're talking, an eye for an eye is one thing, but when you're making a decision on somebody, then you've got to look at more than eye for an eye.

But when asked about a sexual-assault-strangulation of a woman, he said thirty-years imprisonment was not enough punishment.

Asked later by defense counsel if he believed in an eye for an eye:

A: It all depends on the circumstances and the story, you know, how much proof there is. But, you know, on one hand I believe, you know, you take a life, you should give a life. But when you look at it and you sit here now the way I am, maybe life's the way to go.

Asked if he could accept psychiatric evidence as potential evidence in mitigation of that act, he said:

A: No.

Q: That's not something you would think would matter in that context?

A: I'll listen to it. I'm a very good listener.... [B]ut, no I won't take it as an excuse, you know?

. . .

A: I can't answer that until I hear the whole circumstances.... And this insanity is not an excuse.

. . .

A: It's just an excuse to get out of the death penalty.

. . .

A: I've got to be honest with you, I don't look at it as an excuse.

Reminding Leslie of his barroom example, the prosecutor got Leslie to agree that he could not reject the evidence out of hand.

Boy, it goes against me right now, but I probably could.

And to agree that he would not "vote against" defendant "no matter what you heard":

A: No, I couldn't live with myself and do that, no.

The court agreed to reconsider its decision on the motion to disqualify Leslie until it read the transcript of the questioning.

I read the transcript that was provided to me.... Obviously one of those reluctant jurors who would rather not make the decision but if he did he would—he would be very fastidious with respect to any psychiatric testimony.... "You mean it's easy to say in a barroom kill them all but when you got to do the voting it is a little tougher?" Answer: "Yeah.["] ["]Would you give both sides in this case an honest and fair evaluation and listen and make a fair decision?" Answer: "Definitely.["] ["]And no matter what you heard would you vote against him?" Answer:

"No." And then the question was "Would you do that?" And the answer was "No, I couldn't live with myself and do that, no."

The court qualified Leslie.

## D.

*Voir dire* procedures and standards are traditionally within the broad discretionary powers vested in the trial court and "its exercise of discretion will ordinarily not be disturbed on appeal." *State v. Jackson,* 43 *N.J.* 148, 160, 203 *A.*2d 1 (1964), *cert. den. sub nom. Ravenell v. New Jersey,* 379 *U.S.* 982, 85 *S.Ct.* 690, 13 *L.Ed.*2d 572 (1965). *State v. Singletary,* 80 *N.J.* 55, 402 *A.*2d 203 (1979), discussed the rationale for this deference to the trial court:

Decisions concerning the potential bias of prospective jurors are primarily subjective in nature. They require at bottom a judgment concerning the juror's credibility as he responds to questions designed to detect whether he is able to sit as a fair and impartial trier of fact. Consequently, such evaluations are necessarily dependent upon an observation of the juror's demeanor during the course of *voir dire*—observations which an appellate court is precluded from making.

. . .

Inasmuch as the trial judge observed the venireman's demeanor, he was in a position to accurately assess the sincerity and credibility of such statements, and we should therefore pay due deference to his evaluation. . . .

[*Id.* at 63–64, 402 *A.*2d 203 (citations omitted).]

In reviewing capital jury *voir dire* proceedings in *State v. Biegenwald,* 106 *N.J.* 13, 35–37, 524 *A.*2d 130 (1987)(*Biegenwald I* ), and *State v. Ramseur,* 106 *N.J.* 123, 256–57, 524 *A.*2d 188 (1987), we found in each case that the trial court's approach to the problems of death qualifications and pre-trial publicity were entitled to deference. We further noted in *Ramseur* that "[a] sensitive weighing and appraisal of a juror's entire response must be made by the trial court in its duty to resolve the question of whether the juror has shown bias or prejudgment. . . ." *Id.* at 257, 524 *A.*2d 188. It has also been observed that this Court is "perhaps too far removed" from the realities of the *voir dire* to appreciate the nuances concealed by a "bloodless record"; therefore deference to the trial court is usually prudent. *Id.* at 260, 524

*A.*2d 188 (quoting *State v. Gilmore,* 103 *N.J.* 508, 547, 511 *A.*2d 1150 (1986) (Clifford, J., dissenting)); *see also Biegenwald I, supra,* 106 *N.J.* at 37, 524 *A.*2d 130 (noting that trial court's rulings on excusals for cause are "highly discretionary").

 We are satisfied that the trial court correctly qualified Applegate, but we cannot agree that Shampaner or Leslie were qualified to serve. Each expressed a convincing bias against considering psychiatric evidence. That bias was especially crucial here because the defense included a claim of organic brain defect, not the type of thing about which a fair-minded juror should have reservations. Here, as in *Moore, supra,* 122 *N.J.* at 453–54, 585 *A.*2d 864, the concept of mental disease was critical to defendant's case. "Anyone moderately familiar with criminal trials and the public's reaction where juries acquit on murder charges by reason of defendant's insanity knows the strength of these concerns and the vulnerability of the justice system to extreme erosion of confidence. Sociological studies confirm this." *In re Edward S.,* 118 *N.J.* 118, 139, 570 *A.*2d 917 (1990) (citing Valerie P. Hans, *An Analysis of Public Attitudes Towards the Insanity Defense,* 24 *Criminology* 393, 396, 404 (1986) (89.2% of those polled believed that insanity defense allowed guilty persons to go free)). Of course the prosecutor's questions enabled each to agree that he or she would not reject the evidence out of hand. There is hardly ever a juror seated who will directly state that he or she would be unfair and reject evidence out of hand.

One of the problems that we have in capital cases is that the constitutionally-limited *Adams–Witt* standard for disqualification of jurors in capital cases (would their personal views in the morality, utility, or efficiency of the death penalty "substantially interfere" with their ability nevertheless to follow and apply the State's death-penalty statute?) gets confused with the more general inquiry into juror predispositions or preferences that should mark the general jury-selection process. *Adams v. Texas,* 448 *U.S.* 38, 100 *S.Ct.* 2521, 65 *L.Ed.*2d 581 (1980) and *Wainwright v. Witt,* 469 *U.S.* 412, 105 *S.Ct.* 844, 83 *L.Ed.*2d 841 (1985). For example, in a non-capital case, we almost invariably permit questioning of jurors about whether they would be inclined to give more credence to law-enforcement witnesses than to others. However, we do not ask the jurors whether the fact that some witnesses are law-enforcement officers "would substantially interfere with their ability to follow the law."

[*Moore, supra,* 122 *N.J.* at 445, 585 *A.*2d 864.]

 If a juror said that she did not believe in the presumption of innocence but would "try" to follow it, we doubt that a court would hesitate to remove such a juror. Mental disease or defect presents a slightly different set of values, but a defendant is entitled not to have to move a mountain to persuade a person of the relevance of mitigating evidence that the Legislature has expressly recognized in its capital sentencing scheme. Challenges for cause are grounded on legally cognizable bases of partiality such as "a personal relationship with a party or witness, or attorney in the litigation, or a biased state of mind concerning a party or issue in the case." *United States v. Annigoni*, 96 *F*.3d 1132, 1138 (9 th Cir.1996).

 The trial court's responsibility to preserve the integrity of the jury "under both the federal and state constitutions ... is at its peak in cases involving the death penalty." *Williams I, supra*, 93 *N.J.* at 63, 459 *A*.2d 641; *see Ramseur, supra*, 106 *N.J.* at 324 n. 84, 524 *A*.2d 188. The Sixth Amendment right to a "trial by an impartial jury ... goes to the very essence of a fair trial." *Williams I*, supra, 93 *N.J.* at 60, 459 *A*.2d 641. "All doubts concerning a juror's 'sense of fairness or ... mental integrity' should be resolved by dismissing the challenged venireman." *Singletary, supra*, 80 *N.J.* at 65, 402 *A*.2d 203 (quoting *Jackson, supra*, 43 *N.J.* at 160, 203 *A*.2d 1); *State v. Deatore*, 70 *N.J.* 100, 106, 358 *A*.2d 163 (1976)(holding that "the obvious and practical way to handle the situation of a prospective juror having connections with a party or witness which might possibly affect impartiality is to excuse the juror by consent at the outset.").

This Court has emphasized the right to trial by an impartial jury, secured by Article I, paragraph 10 of the New Jersey Constitution as well as the [S]ixth [A]mendment of the United States Constitution, requires that a jury panel must be "as nearly impartial 'as the lot of humanity will admit.'" *Williams I, supra*, 93 *N.J.* at 60–61, 459 *A*.2d 641 (*quoting Singletary, supra*, 80 *N.J.* at 62, 402 *A*.2d 203). "This requirement of fairness—and particu-

larly jury impartiality—is heightened in cases in which the defendant faces death." *Id.* at 61, 459 *A.*2d 641. These two jurors were not as nearly impartial "as the lot of humanity will admit."

Although the trial court erred in qualifying those two jurors, we do not find that the loss of two peremptory challenges to excuse the jurors produced an unfair trial. In *State v. Bey,* 112 *N.J.* 123, 154, 548 *A.*2d 887 (1988) (*Bey II* ), we explained that an improper denial of a for-cause challenge does not always require a new trial. Among the factors to be considered are whether the jurors were eventually removed from the jury, the stage at which they were removed, the effect on counsel's strategy, any apparent unfairness to the defendant, and whether additional peremptory challenges were required.

In this case, each juror was qualified at an early stage in the *voir dire* process and was eventually removed from the jury without any apparent unfairness to defendant. Before us, defendant claims that unfairness arose because two jurors sat who were biased or at least unfavorable to him. Specifically, defendant contends that Juan Valdes and Shilpaben Patel were partial jurors who sat on his case.

The only indication of partiality Patel gave was in her questionnaire, in which she wrote that Mrs. Place's age might impair her ability to be impartial in this case. The totality of her *voir dire* demonstrates that Patel had an open mind. Patel indicated that she had not formed opinions on the case. In her questionnaire, she expressed no general views on the death penalty, explaining, "I wasn't sure, so I didn't answer that." She worked in a hospital and was aware of the fact that psychiatric counseling can be helpful to people. Juan Valdes said in his questionnaire that his general view on the death penalty was that it was a "tough decision for anyone to make. It's against, kind of, I guess, my religion." Furthermore, defendant's claim that Valdes and Patel were partial jurors is belied by defendant's decision not to challenge either juror for cause or peremptorily. *State v.DiFrisco,* 137 *N.J.* 434, 471, 645 *A.*2d 734 (1994) (*DiFrisco II* ).

### 3. THE DISQUALIFICATION OF A LIFE–PRONE JUROR

The trial court removed for cause Mario Roberti, a juror who had reservations about the death penalty. Defendant argues that the exclusion of Roberti was error. Here is some of the colloquy with the court.

Q: What would you say is your general feeling about the death penalty?

A: Probably be against it if I had to absolutely choose.

Q: Okay. Let us assume for a second that you won't absolutely have to choose but that it is an option that you have. If you are presented with the proper evidence could you choose that option?

A: Probably not, no.

Asked if he would sentence one such as the Oklahoma City bomber to death, Roberti said he would "probably not" impose the death sentence.

Q: Why not? I want reasons. What are your reasons for not imposing the death sentence in that case?

A: Because, like I said, I don't know if anyone can really say just because you did this, he did all that, that you could kill him for it.

There followed an exchange during which Roberti explained that he was not likely to sentence to death one such as Jeffrey Dahmer, who had cannibalized his youthful victims:

Q: Are there any kinds of murders where you would believe that the death penalty is appropriate penalty? Other than your family?

A: Probably not, no.

Q. Under any circumstances.

A. No.

The defense sought to rehabilitate Roberti.

Q. Can you put aside ... your own personal beliefs about the goodness or the badness of the death penalty and participate with the other eleven jurors and reach a determination as the judge gives you the law and then vote your conscience on it? I mean can you do that?

A: Yeah, I—yeah.

. . .

Q. Can you participate in the process and hear the judge's charge and tell the judge that you'll consider both alternatives personal feelings aside?

A: I guess. I mean since I don't feel like obviously when I filled that [questionnaire] out I didn't feel that strongly, but I guess I really could, though I really wouldn't want to. . . .

Q: But you would follow the judge's instructions and you would basically follow the law as the judge gives it to you as a juror and a citizen?

A. Yeah. . . . I mean I don't think it's like my place but I guess I would have to. . . . If it was so bad that I thought so. I mean obviously if I felt that I could then I would.

. . .

The prosecutor then followed up:

Q: Okay. How about a case with one person strangling another person in their home?

A: That wouldn't be enough I don't think.

The court then followed up Roberti's answer that he could impose the death penalty if the law required it by explaining that the decision was ultimately the juror's choice. The court asked Roberti if he was saying the following:

But if I am not forced by law to do it then I won't do it. If I have the choice for— of life imprisonment for thirty years I will always give the life imprisonment for thirty years. Even in the Dahmer case, even in the McVeigh case or any other case?

A. Right.

We are satisfied, as was the trial court, that Roberti's views, to which he was fully entitled, would have substantially interfered with his ability to perform the duties of a juror in a capital case. The trial court did not abuse its discretion in disqualifying him.

### 4. REVERSAL IN THE ORDER OF EXERCISE OF PEREMPTORIES AND GRANT OF AN ADDITIONAL PEREMPTORY CHALLENGE TO THE STATE.

These two issues are related. Thus, we shall discuss them together. Because this was a murder case, defendant had twenty peremptory challenges and the State had twelve. *R.* 1:8–3D.

## A.

The trial court employed a struck jury in this case. After qualifying fifty jurors, *voir dire* ceased, and the parties exercised their peremptory challenges. The peremptory challenge process commenced with the court seating in the jury box fourteen qualified prospective jurors. When potential jurors were struck, other jurors replaced the excused prospective jurors. At the conclusion of the striking process, the fourteen jurors situated in the jury box sat on the case.

At a pre-trial hearing, defendant had moved for additional peremptory challenges. The court believed that it should wait until *voir dire* and said that it would decide the issue if it arose during the jury-selection process.

The State exercised the first peremptory challenge. The jury-selection process continued with defendant and the State alternating removing jurors. After defendant exercised his fifth peremptory challenge, the court directed the defense to strike another juror. On behalf of defendant, counsel struck a juror and immediately thereafter asked to be heard at sidebar. At defense counsel's request, the court held an off-the-record discussion. On the record, the court explained that it had asked the defense to excuse two jurors consecutively because defendant had eight more remaining peremptory challenges than the State and the court believed that it would be fairer to have defendant exercise back-to-back strikes so he would not have the ability to excuse eight consecutive jurors after the State had exhausted its challenges. Specifically, the court stated to counsel: "I want to bring a little more balance to the selection process between the two sides, because otherwise you're going to be sitting here selecting the last eight or excusing the last eight."

Counsel argued that he, co-counsel, and defendant's jury consultant had planned a strategy for striking jurors based on the assumption that defendant and the State would alternate exercising peremptory challenges. Counsel argued that the order for excusing jurors should have been discussed beforehand. The

court agreed that the striking order should have been discussed prior to the commencement of the striking process and stated that it had planned to hold a discussion of this issue earlier in the morning but had not done so. After the objection, the court reversed its ruling and reverted to having the parties alternate using their peremptory strikes.

Later in the striking process, the State had passed on three opportunities to exercise a peremptory challenge. The defense then exercised its fourteenth challenge, and thus had six strikes remaining, while the State had used all but two of its challenges. At a sidebar, the prosecutor asked the court to modify the striking order. The court declined but noted that it had the discretion to grant additional peremptory challenges to the State and that it would exercise that discretion if needed.

After defendant exercised his nineteenth peremptory challenge, Juror Jeffreys took her place in the jury box. At a sidebar, the prosecutor, who had exhausted his strikes, moved for an additional peremptory challenge so that he could strike this juror whose fiancé had been convicted of arson in Middlesex County, the venue of both the murder and trial. Jeffreys believed that her fiancé was treated unfairly because he received an inferior deal through plea bargaining than his co-defendant. Over defendant's objection, the court gave the State an extra peremptory challenge because it believed that the State had a good reason to strike the juror. The defense asked for an extra peremptory challenge, but the court declined to grant the request. Instead, the court stated it would consider granting an extra peremptory strike if defendant needed it and had a good reason for it.

The State struck Jeffreys, who was replaced by Juror Knight. The defense, exercising its final peremptory challenge, excused Juror Harmon, whom Juror Burton replaced. The trial court asked counsel if they had any applications. The defense answered, "No, Judge. The jury is satisfactory to the defense." The State also found the jury satisfactory. Occupying jury seat

fourteen, Burton was an alternate juror. He did not deliberate in either phase of the bifurcated capital trial.

### B.

In *State v. Brunson*, 101 *N.J.* 132, 501 *A.*2d 145 (1985), Justice Stein exhaustively, reviewed the subject of the proper order of exercising peremptory challenges. Despite the importance of the matter, the subject appears to have been left to the discretion of courts with little guidance and without uniformity. *See State v. Myers*, 239 *N.J.Super.* 158, 167, 570 *A.*2d 1260 (App.Div.1990)(reciting prosecutor's response to adversary that "I've been trying cases here for ten years" to rely on a local practice that allows a challenge after both parties have passed). After reviewing practices in federal and state courts, *Brunson* held that the order of exercise of peremptory challenges was not of constitutional dimension but the existing practice deserved more careful study. *Id.* at 145, 501 *A.*2d 145.

In *Brunson*, the trial court had adopted a one-for-two challenge procedure during the first eight rounds of challenges. *Id.* at 135, 501 *A.*2d 145. In other words, the defendant was required to exercise, during those eight rounds, two challenges for each one exercised by the State. Observing that the same effect could have been achieved by strategy of the prosecutor, the Court found no reversible error but saw the need for change. It said:

> We are nevertheless impressed by the desirability of a standardized procedure for the implementation of the exercise of peremptory challenges in criminal cases. Accordingly, we will solicit the recommendation of our Criminal Practice Committee as to the establishment by Court Rule of a procedure governing the exercise of peremptory challenges. In the interim, to maintain uniformity trial courts should refrain from using peremptory challenge procedures that differ from the customary, one-for-one, alternating method.
>
> [*Id.* at 145, 501 *A.*2d 145 (footnote omitted).]

The Criminal Practice Committee declined to adopt a hard-and-fast rule but, instead, recommended the rule in place at the time of the trial that stated:

> Upon indictment for kidnapping, murder, aggravated manslaughter, manslaughter, aggravated assault, aggravated sexual assault, sexual assault, aggravated criminal

sexual contact, aggravated arson, arson, burglary, robbery, forgery if it constitutes a crime of the third degree as defined by *N.J.S.A.* 2C:21–1b, or perjury, the defendant shall be entitled to 20 *peremptory challenges if tried alone* and to 10 such challenges when tried jointly; and the State shall have 12 peremptory challenges if the defendant is tried alone and 6 peremptory challenges for each 10 afforded defendants when tried jointly.

. . .

In any case in which each side is entitled to an equal number of challenges, those challenges shall alternate one by one, with the State in a criminal case and the plaintiff in a civil case exercising the first challenge.

. . .

The passing of a peremptory challenge by any party shall not constitute a waiver of the right thereafter to exercise the same against any juror, unless all parties pass successive challenges.

[*R.* 1:8–3(d),(e).]

 Applying the analysis of *Brunson,* we are satisfied that there was no fundamental constitutional error in the court's mid-trial change in the order of exercise of peremptories. The court rather quickly reversed course and reinstated the customary procedure.

## C.

 Concerning the grant of an extra peremptory to the State without a corresponding grant of an extra peremptory to defendant, we believe that the proper analysis should be that which applies to the loss of a peremptory challenge by the failure to excuse a juror for cause. Applying the balance of factors set forth in *Bey II, supra,* we are satisfied that prejudice did not arise. As noted, the trial court indicated its willingness to grant an extra peremptory to defendant if needed.

Were we not convinced from the general tenor of the *voir dire* that the court would have responded to such a request, we would have genuine concern. The relationship of court and counsel was marked by candor and professionalism. Had counsel had an abiding concern about the need for an extra peremptory challenge,

we surmise that the court would have responded favorably. Moreover, Jeffreys could well have been excused for cause. Remember, at this stage, the State held no more challenges. If defendant asked for one more peremptory challenge and exercised it, he might have drawn a juror less desirable than those who sat.

## III.

### *Trial Issues*

### 1. ADMISSIBILITY OF MEDICAL EXAMINER'S EXPERT TESTIMONY REGARDING CAUSE OF DEATH

#### A.

Because Dr. Marvin Shuster, the Middlesex County Medical Examiner, was ill and unable to testify at trial, he gave a videotaped deposition, which the trial court admitted in lieu of his in-court testimony. Shuster was qualified at the deposition as an expert in forensic pathology.

Shuster saw Mrs. Place at the crime scene the day neighbors found her, and he performed an autopsy on her two days after she died. At the deposition, Shuster detailed Mrs. Place's injures, which he observed while conducting the autopsy, and their significance.

When the prosecutor asked Shuster about the belt that was tied around Mrs. Place's mouth, the State broached the subject of cause of death:

Q: If [the ligature was] all she had on her neck would that cause her death?

A: I thought she had a combination of mechanisms of strangulation and those were both manual and ligature strangulation.

The State's direct examination of Shuster concluded with a brief discussion of the causes of Mrs. Place's death.

Q: Okay. As a result of your—of your autopsy and the—and the viewing at the scene and whole procedure that you did with Mrs. Place I would ask whether or not in your area of expertise you have an opinion on the cause of death.

A: I thought she died of the assault which was compounded by strangulation, both manual and ligature.

Q: Okay. So the total assault plus strangulation manually and by this ligature?

A: Yes.

Defendant did not object to this testimony.

On cross-examination, Shuster testified that he did not believe Mrs. Place's broken neck (injured in the fall) caused her death because the fracture occurred "without separation and without overriding." The cross and redirect examinations did not cover the cause of Mrs. Place's death, except for whether the fractured vertebrae constituted a mechanism of death.

At trial, Dr. John E. Adams, the defense expert in forensic pathology, testified that either the manual strangulation or the broken neck could have caused Mrs. Place to die.

### B.

Defendant contends that Shuster's testimony that "the assault" caused Mrs. Place's death was inadmissible "ultimate issue" evidence and should have been deleted from the videotape shown to the jury. According to defendant, this testimony failed to identify the mechanism or cause of death and "put an impermissible expert *imprimatur* on the State's theory that the death was intentional." Defendant argues that Shuster's cause-of-death testimony was not supported by the factual evidence and hence was also inadmissible net opinion.

It is defendant's position that by designating "the assault" as the cause of death, Shuster implied that defendant had intentionally murdered Mrs. Place. This conclusion exceeded the bounds of proper expert testimony and encroached on the jury's duty to decide the ultimate issue, whether defendant purposefully or knowingly murdered Mrs. Place. According to defendant, Shuster's testimony therefore violated defendant's right to a fair trial and its admission into the trial was plain error.

### C.

[E]xpert opinion is admissible if the general subject matter at issue, or its specific application, is one with which an average juror might not be sufficiently

familiar, or if the trial court determines that the expert testimony would "assist the jury in comprehending the evidence and determining issues of fact."

[*State v. Berry*, 140 *N.J.* 280, 292–93, 658 *A.*2d 702 (1995) (quoting *Odom, supra*, 116 *N.J.* at 70, 560 *A.*2d 1198).]

Despite the imprecision of his testimony, we are convinced that Shuster's cause-of-death testimony assisted the jury's understanding of the facts. Most importantly, the totality of the testimony informed the jury that he considered the two forms of strangulation to be causes of Mrs. Place's death. The portion of the testimony in which Shuster named "the assault," or in the prosecutor's words "the total assault," revealed that the combination of injuries Mrs. Place suffered during her encounter with defendant also could not be ruled out as causes of death.

Shuster's opinion regarding the cause of Mrs. Place's death was not an inadmissible net opinion. The net-opinion rule forbids the admission into evidence of an expert witness's conclusion that is unsupported by factual evidence. *Lanzet v. Greenberg*, 126 *N.J.* 168, 186, 594 *A.*2d 1309 (1991). Shuster based his opinion concerning the cause of death on his crime-scene observations and his autopsy of Mrs. Place, which he described at length during his deposition before announcing his cause-of-death opinion. Although Shuster did not explicitly testify that he based his opinion on his crime-scene observations and autopsy findings, the jury could easily infer the bases of Shuster's expert opinion regarding the cause of Mrs. Place's death.

Whether Shuster's cause-of-death testimony exceeded the scope of permissible expert opinion is a more complex question. Defendant argues that by expressing the opinion that "the assault" was a cause of death, Shuster essentially told the jury that he believed defendant had committed a purposeful-or-knowing murder. In *Odom, supra*, we held that "the determination of facts that serve to establish guilt or innocence is a function reserved exclusively for the jury. Hence, an expert's testimony that expresses a direct opinion that defendant is guilty of the crime charged is wholly improper." 116 *N.J.* at 77, 560 *A.*2d 1198

(citation omitted). However, "as long as the expert does not express his opinion of defendant's guilt but simply characterizes defendant's conduct based on the facts in evidence in light of his specialized knowledge, the opinion is not objectionable even though it embraces ultimate issues that the jury must decide." *Id.* at 79, 560 *A.*2d 1198 (permitting detective to testify as illegal-narcotics expert and express the opinion that defendant possessed drugs for distribution).

*State v. Jamerson,* 153 *N.J.* 318, 708 *A.*2d 1183 (1998), set the bounds of proper expert testimony by a medical examiner qualified only as an expert in forensic pathology. In *Jamerson,* the medical examiner stated that an automobile accident caused by a drunk driver was a homicide. *Id.* at 330–33, 708 *A.*2d 1183. The defendant contended that he did not recklessly cause the victims' deaths and, as a result, was not guilty of reckless homicide. *Id.* at 334–36, 708 *A.*2d 1183. Holding that the medical examiner should not have been permitted to testify that he believed the defendant had committed reckless homicide, we concluded that the medical examiner's "testimony should have been limited to describing the physical properties of the implement that caused the [victims'] deaths, narrating the physiological status of the bodies at the time of death, and ruling out the possibility that the injuries were self-inflicted or sustained as a result of mere inadvertence." *Id.* at 337, 708 *A.*2d 1183. Noting that there were no wounds to analyze, we reasoned that the medical examiner could not assist the jury with respect to whether the collision was a reckless homicide or an accidental death because, as a forensic pathologist, he was in no better position than the jury to make that determination. *Id.* at 340–41, 708 *A.*2d 1183. We also emphasized that the trial court did not qualify the medical examiner as an expert in accident reconstruction. *Id.* at 330, 339, 708 *A.*2d 1183.

 Shuster, unlike the medical examiner in *Jamerson,* did not testify that defendant purposefully or knowingly murdered Mrs. Place. Thus, he did not express a direct opinion on defendant's guilt of capital murder. However, Shuster's characterization of

Mrs. Place's encounter with defendant as an assault was not based on his specialized knowledge as a forensic pathologist. *Odom, supra,* 116 *N.J.* at 79, 560 *A.*2d 1198. The trial court qualified Shuster as a forensic pathologist, not as an expert in crime scene reconstruction. Defendant argues that Shuster had no greater ability than the jurors to determine whether the deadly encounter was an assault or an accident, *Jamerson, supra,* 153 *N.J.* at 341, 708 *A.*2d 1183, and that the trial court should not have permitted Shuster to testify that "the assault" was a cause of Mrs. Place's death.

There is a significant difference between Shuster's statement concerning the cause of death and expert testimony that explicitly states that defendant intentionally killed Mrs. Place. Although an "assault" might connote a deliberate attack, it also served to describe the two neck injuries and other signs of trauma that he found. In addition, intentional conduct is conceptually distinct from intent to bring about a specific result. Defendant's intent to cause severe bodily injury or. death does not follow logically from his intent to cause some bodily injury. Not every non-deadly assault is an attempted murder, as evidenced by State statutes proscribing felony murder, manslaughter, or death by automobile. Therefore, we believe that Shuster's testimony that "the assault" caused Mrs. Place's death was not tantamount to an expert opinion that defendant purposefully or knowingly murdered Mrs. Place or a mischaracterization of the events.

Although Shuster might better have described Mrs. Place's cause-of-death as resulting from two forms of strangulation, the trial court did not commit plain error when it failed to redact his reference to "the assault."

## 2. ADMISSIBILITY OF THE STATE PSYCHIATRIST'S EXPERT TESTIMONY

### A.

In response to testimony that defendant suffered from a mental condition that prevented him from acting purposefully or knowing-

ly when he killed Mrs. Place, the State introduced the psychiatric expert testimony of Doctor Stanley Portnow. The trial court qualified Portnow as an expert. He had thirty-nine years of experience in practice and at that time held the position of clinical professor of psychiatry at the New York University Medical School.

Portnow testified that defendant suffered from no major mental disease or disorder but had antisocial personality disorder and a polysubstance dependence problem. Despite the court's cautionary instruction to the prosecutor, Portnow was permitted to embark on these rambling monologues:

Q. And you indicated earlier on the evening previous to the homicide that he had, he had been in a bar, he had been drinking, I think?

A. Yes.

Q. Is that—would you expect that?

A. Yes, that's his everyday operation. He intentionally ran from his parents' home, not because he was mentally ill or he was hearing voices telling him to run, but he intentionally ran with the purpose of evading the police because he was scared.

He arrived at the decedent's home knowing that it was not his home and that it was illegal to enter the premises. He was not so out of it that he did not know those things. He nevertheless climbed through the open basement window. His intention and purpose was to evade the police and hide out so he could not be discovered.

He was not hearing voices at the time and was able to adequately use his judgment for its criminal purpose.

When the lady, when Mrs. Place came home and they confronted one another, he put her in a sleeper hold with the express, with the express purpose of making her unconscious so that she would never be able to report him. He did not feel a threat—a physical threat from her. He just wanted to be sure that she never reported him to the police.

Believing that the woman was faking unconsciousness, he threatened to assault her in the anus if she did not wake up. He said that women don't generally like anal intercourse and if she heard him, she would wake up. With the express purpose of engaging in the threatened sexual act with her, he cut off her clothes with a with pair of scissors which he retrieved from the basement and apparently had some form of sexual contact with her. At least some sperm was found around the anal orifice.

He did not have any money so he stole his victim's credit cards and car keys for the purpose of furthering his intention of escaping. He made a phone call about which we have talked in order to conceal the location of where the call originated

from. He phoned a girlfriend in New York. They used the lady's credit cards to purchase wine and champagne, and he got drunk again.

There is no underlying mental disease or disorder in this case. And if I read Dr. Apolito's [the defense witness] report correctly, he agrees. Mr. Papasavvas does have an antisocial personality disorder which is an Axis II [psychiatric diagnosis], but that is not a [major] mental disease or disorder in the sense of an Axis I of the American Psychiatric Association. Mr. Papasavvas knew exactly what he was doing. He exercised his judgment for the purpose of keeping the police from detecting his whereabouts so he would not be arrested. In order to achieve this purpose, he broke into and entered the home of the deceased and hid there. When Mrs. Place happened upon him and he realized that she would call the police, he killed her and sexually assaulted her before stealing her credit cards and car keys.

. . .

Q: [W]hat relevance did [defendant's head injuries] have in your estimation ?

A: Well, I don't think they played much of a role here. This is a man who was not deranged either organically or psychiatrically. He certainly was oriented. He was not hearing voices. He, he was, everything that he did was goal-directed and purpose-directed.

I do not believe—I don't doubt that he was, that he sustained concussions and serious injuries on both of those occasions, but according to at least Dr. Miller's report, he had made a complete recovery, at least was back to his baseline level from before the accident and, therefore, the accidents can play no role in the understanding of this incident.

People who, people who act aggressive, people who act out, who have organic brain damage, do so impulsively, almost like without thinking. They get a discharge from the central nervous system and they run amok. That is not what happened here. This was a thought, goal-directed action. This was, there was nothing, in other words, there was nothing impulsive. The woman can identify me, I'll put her in a sleeper hold, throw her down the steps if she is not already dead. That is not an organic impulsive acting out. People who have organic brain damage are still capable of premeditating crime, just like schizophrenics. Just because you're schizophrenic doesn't mean you have the right to go out and kill someone and the type of activities as I have it recorded here.

At this point, defense counsel objected. Sustaining the objection, the trial court immediately gave a curative instruction:

Ladies and gentlemen of the jury, I've got to tell you something. I've been listening to this doctor now for the last five minutes tell us that this gentleman is guilty of everything he's charged with. That is not his job. That is your job. You are here; you've heard all of the evidence. You've heard all of the testimony and you're going to decide whether this gentleman is guilty of any of the crimes charged, not this doctor. That is not his job. He call tell us about psychiatric, state of mind, cognitive functions. That's what he's an expert on. But, he's not here to tell us that Mr. Papasavvas is guilty of anything. That's not his job.

That's what you're going to decide. And I want to make sure that you realize that because sometimes we are led by an expert's opinion. If the expert believes so, it must be so. No. It will be your job to determine whether he's guilty of any of the charges.

When the State resumed its direct examination, Portnow concluded that defendant did not suffer from any type of mental disease or disorder that would have deprived him of a substantial capacity to know or appreciate the nature and quality of his actions or that they were wrong. Defense counsel, arguing that Portnow had testified to the ultimate issues in the case, moved for a mistrial. In the alternative, defense counsel asked the court to instruct the jury to disregard Portnow's entire testimony. The trial court agreed that Portnow had usurped the jury's function by giving an opinion of defendant's guilt. However, the court denied the motions and concluded that the curative instruction sufficiently remedied the admission of improper expert testimony. The trial court noted that the jurors had understood the instruction, and the court had observed several jurors nod their heads in assent to the cautionary instruction.

In the guilt-phase charge, the court gave a general expert-testimony instruction. The court also gave an additional cautionary instruction regarding Portnow's testimony:

Now, one of the doctors, Doctor Portnow, gave you some testimony that seemed to indicate his opinion as to the guilt or innocence of the accused. Those answers were inappropriate and improper, and I so told you at the time that he made these statements.

### B.

As stated earlier, an expert witness may not express a direct opinion on the defendant's guilt or innocence. *Odom, supra*, 116 *N.J.* at 77, 560 *A.*2d 1198. Moreover, it is impermissible for an expert to express his or her opinion "in such a way as to emphasize that the expert believes the defendant is guilty of the crime charged under the statute." *Id.* at 80, 560 *A.*2d 1198. However, "as long as the expert does not express his opinion of defendant's guilt but simply characterizes defendant's conduct based on the facts in evidence in light of his specialized knowledge,

the opinion is not objectionable even though it embraces ultimate issues that the jury must decide." *Id.* at 79, 560 *A.*2d 1198.

An expert witness also may not comment on a witness's credibility. *Jamerson, supra,* 153 *N.J.* at 341, 708 *A.*2d 1183. Credibility judgments come within the jury's province. *Ibid.* "There is simply no scientific foundation for an expert's evaluation of the credibility of a witness or the conclusion that a psychologist or other social scientist has some particular ability to ferret out truthful from deceitful testimony." *State v. J.Q.,* 252 *N.J.Super.* 11, 40, 599 *A.*2d 172 (App.Div.1991), *aff'd,* 130 *N.J.* 554, 617 *A.*2d 1196 (1993).

A portion of Portnow's expert testimony was thus improper. Portnow twice exceeded the limits of permissible expert testimony by commenting on his opinion of defendant's guilt. In one instance, Portnow testified that defendant, to evade police officers who had questioned him, "broke into and entered the home of the deceased and hid there. When Mrs. Place happened upon him and he realized that she would call the police, he killed her and sexually assaulted her before stealing her credit cards and car keys." This statement represents Portnow's direct opinion that defendant was guilty of the crimes of which he was charged. In another instance, Portnow again, albeit less explicitly, as much as accused defendant of committing a purposeful murder—". . . just because you're schizophrenic doesn't mean you have the right to go out and kill someone and the type of activities as I have it recorded here."

The trial court, however, issued a curative instruction immediately after that statement, telling the jury that it, not Portnow, would decide whether defendant is guilty of any of the crimes charged. The trial court repeated a similar instruction during the guilt-phase charge, in which the court told the jury that Portnow's testimony regarding defendant's guilt was improper. The court also stressed that Portnow could testify only to defendant's psychiatric condition and state of mind.

Although the bulk of Portnow's testimony was permissible, the testimony in which he directly commented on his belief in defendant's guilt was improper. However, the trial court's curative instructions given immediately after Portnow's statements and at the guilt-phase charge were sufficient to remedy Portnow's improper testimony. *State v. Winter*, 96 *N.J.* 640, 477 *A.*2d 323 (1984); *see also State v. Timmendequas*, 161 *N.J.* 515, 580, 737 *A.*2d 55 (1999)(holding curative instruction ameliorated prejudice from witness's emotional outburst). We therefore hold that the testimony did not create reversible error.

### 3. ADMISSIBILITY OF EVIDENCE OF LAWSUIT FILED BY THE VICTIM'S DAUGHTER

Defendant claims that the trial court erred in denying counsel the right to cross-examine Sandra Nutbrown[4], the victim's daughter, concerning the basis of her civil lawsuit against defendant and his doctors. In that lawsuit, she alleged that defendant was a dangerously ill person, and that his physicians had negligently failed to protect others such as Mrs. Place from his condition. The trial court correctly excluded this line of questioning because the witness' lawsuit did not affect her credibility on the matters to which she testified. In the penalty phase of the trial, such evidence would have been relevant if its purpose was to establish that defendant did in fact suffer from a mental disorder. Nutbrown, however, lacked the expertise to offer such an opinion. If she possessed expert opinion evidence to that effect, the evidence would have been admissible, if properly presented. Because that type of evidence was not present, we hold that the trial court did not err denying defense counsel's questions concerning the legal theories of Nutbrown's civil lawsuit. Recall that in *State v. Nelson*, 155 *N.J.* 487, 520–21, 715 *A.*2d 281 (1998), the claimant

---

[4] In Nutbrown's testimony, she authenticated photographs of Mrs. Place's bedroom. She also testified that Mrs. Place owned both the scissors, which were used to cut Mrs. Place's clothing, and the shoes, which were found in Mrs. Place's car in New York City.

alleging police misconduct that was relevant in the penalty phase did possess the expertise to make the allegations.

## 4. OTHER GUILT PHASE ISSUES

Defendant claims that the prosecutor committed misconduct during his summation because his allegation that defendant threw Mrs. Place down the steps was not supported by the evidence. The prosecutor made the following assertions:

And this all happens at the top of the stairs, not the bottom of the stairs.

And it shows beyond a reasonable doubt that this confrontation took place in the hallway at the top of the stairs. Look at the pictures. The button is found there. The button cover is found there. The earring is found there. The skirt is in the closet. The scissors are up there that did the cutting, the straight scissors. And you'll see them.

This is all purposeful conduct at the top of the stairs by a person who is not insane, who has not diminished capacity, but somebody who has a goal. Does it have to make sense? Does the state have to prove motive? No. The judge will tell you we don't have to because we can't figure it all out, but it wasn't a result of somebody falling down the stairs.

. . .

This attack, this assault, this homicide took place upstairs in the hall. And why did the state say that? Because that is what Dr. Shuster basically said. He said in his report, and he still said it, that that broken neck was not a mechanism of death. She could have lived with that.

At trial, defense counsel did not object to any portion of the State's summation.

Defendant now argues that the prosecutor misrepresented the evidence in the case and made baseless accusations against him. According to defendant, the forensic pathology evidence unequivocally showed that Mrs. Place was alive when she fell down the stairs. Further, defendant claims that the prosecutor had no evidentiary basis from which to allege that defendant fatally strangled Mrs. Place and threw her body down the steps. The prosecutor's accusation that defendant beat Mrs. Place prior to strangling her was therefore "pure fabrication." Finally, defendant argues that the prosecutor's allegation that defendant

propped open the door with a broom so that he could throw Mrs. Place down the steps was not supported by the evidence.

"[P]rosecutors in criminal cases are expected to make vigorous and forceful closing arguments to juries." *State v. Frost*, 158 *N.J.* 76, 82, 727 *A.*2d 1 (1999). Prosecutorial misconduct is not ground for reversal of a criminal conviction unless the conduct was so egregious that it deprived defendant of a fair trial. *Timmendequas, supra,* 161 *N.J.* at 575, 737 *A.*2d 55; *Ramseur, supra,* 106 *N.J.* at 322, 524 *A.*2d 188. "To justify reversal, the prosecutor's conduct must have been clearly and unmistakably improper, and must have substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense." *Timmendequas, supra,* 161 *N.J.* at 575, 737 *A.*2d 55 (internal quotations omitted).

A prosecutor's theory of the case will constitute prosecutorial misconduct if it draws unreasonable inferences from the evidence adduced at trial. The prosecutor's comments, however, contained reasonable inferences from the record. It was reasonable to infer that defendant assaulted Mrs. Place at the beginning of their encounter. There was physical evidence of a struggle on the ground floor of Mrs. Place's home. Mrs. Place's earring and two buttons from her sweater were found there. Several articles of her clothing and the scissors that defendant utilized to cut Mrs. Place's clothes were also found on that floor. The cuts in Mrs. Place's clothes were straight, suggesting that Mrs. Place was not conscious when defendant removed her clothing.

The prosecutor also reasonably inferred that defendant fatally strangled Mrs. Place on the first floor. Both Shuster and the defendant's expert listed manual strangulation as possible causes of Mrs. Place's death.[5] Furthermore, the prosecutor's allegation

---

[5] Contrary to defendant's argument in his presentation, Shuster did not rule out manual strangulation as a cause of death. Shuster said "the assault" was compounded by manual and ligature strangulation and then agreed that the "total assault plus strangulation" were the causes of death. Although the

that defendant threw Mrs. Place down the basement stairs derived from the evidence. Defendant's misbehavior that evening gave the prosecutor reason to believe that defendant did not accidentally allow Mrs. Place to fall down her basement steps. Finally, we believe that it was reasonable for the prosecutor to invite the jury to infer that defendant used the broom to prop open the basement door.

Therefore, we conclude that the prosecutor offered reasonable inferences drawn from the evidence presented and did not commit any misconduct during the guilt-phase of this trial.

## IV.

### *Penalty Phase Issues*

### 1. RETENTION OF JUROR WHO OVERHEARD EXTRANEOUS INFORMATION REGARDING DEFENDANT

After conviction, defense counsel moved to dismiss the jury and empanel a new jury to decide sentencing. Defense counsel argued that the media reports about the trial mentioned defendant's pending separate charge for aggravated sexual assault about which no evidence had been presented during the guilt phase. The trial court did not find that good cause existed to empanel a new jury but did agree to individually *voir dire* the jurors to ask if any of the jurors had read the articles or discussed them with friends or family.

During the process of questioning the jurors, one juror reported that he had overheard co-workers discussing a murder case in Middlesex County that may have involved defendant. The conversation took place four days after the jury convicted defen-

---

prosecutor in his opening statement told the jury that Shuster's testimony would identify manual strangulation as the cause of death, he shortly thereafter accurately stated that Shuster would testify that strangulation and assault caused Mrs. Place's death.

dant of capital murder. The court asked if that conversation would affect his "ability to be fair, to be impartial" and the juror responded that it would not.

> Where the court concludes there is a realistic possibility that information with the capacity to prejudice defendant's right to a fair trial may have reached members of jury, it should conduct a *voir dire* to determine whether any exposure has occurred. If there is any indication of such exposure or knowledge of extra-judicial information, the court should question those jurors individually in order to determine precisely what was learned, and establish whether they are capable of fulfilling their duty to judge the facts in an impartial and unbiased manner, based strictly on the evidence presented in court.
>
> [*Bey II, supra,* 112 *N.J.* at 86–87, 548 A.2d 846.]

 The trial court promptly corrected the juror's misperception that another murder charge against defendant existed. The court emphatically told the juror that defendant had never been accused of committing another murder and that defendant was not the subject of the conversation that the juror had overheard. Once the court established that the juror could remain fair and impartial, no further questioning by the attorneys transpired.

The trial court's conclusion that it did not have good cause to remove the juror from the jury has support in the record; thus, the court did not abuse its discretion by retaining the juror on the jury.

## 2. SUBMISSION OF *N.J.S.A.* 2C:11–3c(4)(f) (ESCAPE DETECTION) AGGRAVATING FACTOR

At the penalty phase, the State had sought to establish the c(4)(f) escape detection and c(4)(g) felony murder aggravating factors. On the evening of the murder, the police sought to arrest defendant for an unrelated sexual assault, but he managed to flee from his home before the officers could handcuff him. The trial court precluded the State from attempting to prove the escape-detection factor under the theory that defendant murdered Mrs. Place to avoid apprehension for the unrelated sexual assault. Consequently, the State alleged that defendant murdered Mrs. Place to avoid apprehension for the crimes he had committed within Mrs. Place's house, including burglary, robbery, theft, and

aggravated sexual contact. Five of the twelve jurors found the c(4)(f) aggravating factor.

"The key to finding factor c(4)(f) is that the defendant intended to eliminate a potential witness to his crimes." *State v. Martini*, 131 *N.J.* 176, 280, 619 *A.*2d 1208 (1993) (*Martini I* ). Therefore,

> aggravating factor c(4)(f) may be submitted to the jury when the State has produced sufficient evidence on which a jury can reasonably conclude that at least one of the motives of the defendant in killing his or her victim was to eliminate a witness or avoid subsequent apprehension and prosecution for criminal acts.

> [*Id.* at 282–83, 619 *A.*2d 1208.]

We believe that the State's circumstantial evidence of defendant's motive was sufficient to submit the c(4)(f) aggravating factor to the jury. Based on the facts presented at trial, a rational factfinder could have reasonably inferred that one of defendant's motives for murdering Mrs. Place was to escape detection for the burglary of Mrs. Place's home or other crimes committed within her house. *See State v. Harvey*, 151 *N.J.* 117, 225–26, 699 *A.*2d 596 (1997)(*Harvey II* )(holding State presented sufficient circumstantial evidence to support escape-detection factor in residential-burglary-murder).

Defendant also contends that the escape-detection aggravating factor aggravating factor is unconstitutionally vague or overbroad in that the factor impermissibly duplicates the felony-murder factor. The Court has previously rejected a similar impermissible-duplication claim. *Id.* at 224–26, 699 *A.*2d 596.

Moreover, "when essentially the same evidence is used to support both the c(4)(f) and c(4)(g) aggravating factors," the trial court must instruct the jury not to double count evidence. *State v. Hightower*, 146 *N.J.* 239, 268, 680 *A.*2d 649 (1996)(*Hightower II* ). The double-counting charge, which the trial court gave in this case, tempers the potential prejudice stemming from the use of overlapping evidence to support the escape-detection and felony-murder aggravating factors.

 In any event, only five of the twelve jurors found the c(4)(f) aggravating factor. "Even if the trial court's submission of aggravating factor (f) was in error, the error would have been harmless because the jury did not find aggravating factor (f) unanimously." *DiFrisco II, supra,* 137 *N.J.* at 502, 645 *A.*2d 734.

### 3. PROPRIETY OF ULTIMATE-OUTCOME CHARGE

Defendant asserts that the trial court improperly instructed the jurors not to be concerned "as to whether this defendant, Mr. Papasavvas, will ever be released from prison." Defendant complains that the court's instruction violated his Eighth Amendment right to present mitigating evidence, infringed his due process right to rebut the State's arguments, and conflicted with this Court's holding in *Nelson, supra,* 155 *N.J.* at 505, 715 *A.*2d 281. Although the jury was instructed not to consider such information, defense counsel emphasized that defendant will spend the remainder of his life in prison regardless of the jury's sentencing decision during her opening statement and summation.

In *Nelson, id.* at 501–05, 715 *A.*2d 281, this Court determined that the trial court's ultimate-outcome charge that instructed the jury not to consider in its sentencing decision the likelihood that the defendant would receive consecutive sentences on the two murders she committed, was not reversible error because the jury was fully aware of the consequences of its decision, specifically a choice between death and life in prison.

> When a jury is choosing between life and death, it should not be misled into treating the case as one that it is not. The jury should not be told that in choosing between life and death it may not consider the fact that a forty-year-old defendant is likely to spend the next sixty years in prison if its verdict is life. Such an instruction would conflict with our *Ramseur* holding and impermissibly "hide from the jury the full range of its sentencing options."
>
> In future cases, courts should explain to jurors what we mean when we say that the length of the possible sentences other than death should not influence the jury's determination concerning the appropriateness of a death sentence on a murder count.
>
> [*Id.* at 505, 715 *A.*2d 281 (quoting *Ramseur, supra,* 106 *N.J.* at 311, 524 *A.*2d 188).]

Although the trial court's ultimate-outcome charge in this case did not precisely follow the charge suggested in *Nelson,* the charge conveyed to the jury that it was to decide between a death sentence and a life sentence with a minimum of thirty years of parole ineligibility. Moreover, defense counsel was given the freedom to argue that defendant would never be released from prison if the jury did not sentence him to die.

This case was tried shortly after our decision in *Nelson,* but counsel did not specifically request the *Nelson* charge. In *Nelson,* we concluded that prospective jurors should not be told to disregard the fact that a defendant would spend the rest of his or her life in prison but should be told how that fact relates to deathworthiness. *Id.* at 505, 715 *A.*2d 281. We held that the prior charge would not be reversible error if the jury was fully informed of the consequences of its decision. The charge in this case was similar to the charge given in *Nelson. Id.* at 502, 715 *A.*2d 281.

Defendant also complains that the trial court provided the jury with inconsistent and inaccurate information about the minimum terms that defendant would receive as an alternative to a death sentence. Initially, the court told the jury that the alternative to death would be life imprisonment without the possibility of parole for sixty-three and three-quarter years.[6] During the trial, however, the court stated that the minimum term as an alternative to death would be thirty years. Although the court's preliminary instruction was not the same as its final, it did not constitute prejudicial error. The court cautioned the jury in the preliminary instruction that the number of years of parole eligibility might be different in his final charge, and that the court's final charge as well as the verdict sheet stated that the parole disqualifier for a life-sentenced purposeful-or-knowing murder was thirty years.

---

6 The court initially believed that the No Early Release Act, *N.J.S.A.* 2C:43–7.2, applied to this case. The No Early Release Act requires defendants to serve at least eighty-five percent of their sentences for convictions of violent crimes. Because defendant committed the crimes against Mrs. Place prior to the enactment date and effective date of the Act, the law cannot be applied to him.

There is no evidence that the jury was confused about the period of parole ineligibility. The court's instructions were not so inconsistent that the jury would not have accepted as accurate the thirty-year figure that the court later gave during the *voir dire* and penalty-phase charge and listed on the verdict sheet.

### 4. ALLEGED PROSECUTORIAL MISCONDUCT AT PENALTY–PHASE SUMMATION

#### A.

In reviewing capital prosecutions, we continue to be dismayed by the frequency of prosecutor's comments that lay "beyond the bounds of propriety." *State v. Marshall,* 123 *N.J.* 1, 160, 586 *A.*2d 85 (1991)(*Marshall I* ). In *Marshall I,* for example, the prosecutor stated that "that there [was] a place in hell for [the defendant]." *Id.* at 159, 586 *A.*2d 85. In *Timmendequas, supra,* the prosecutor referred to the defendant as the "village pervert." 161 *N.J.* at 583, 737 *A.*2d 55. In *State v. Rose,* the prosecutor referred to inadmissible evidence and information "not based on any evidence adduced at trial," and "on two occasions ... the prosecutor's argument constituted an inaccurate assertion to the jury that 'the law' mandated the death penalty for [the] defendant." 112 *N.J.* 454, 522, 548 *A.*2d 1058 (1988). In *Moore, supra,* "the prosecutor encouraged imposition of a death sentence by focusing on extraneous matters, namely, noting a general need to protect society, implying that justice mandated a death sentence for a double murder, and characterizing [an] expert witness ... as a 'professional bleeding heart who was indeed duped by the defendant.'" 122 *N.J.* at 461–62, 585 *A.*2d 864. On remand, this Court "caution[ed] against comments such as the accusation that the defense realized that the defense of insanity was meritless," noting that such comments were "clearly an improper expression of the prosecutor's own conclusion." *Ibid.*

In this case, defendant complains of several instances of prosecutorial misconduct. First, the prosecutor made several refer-

ences to the relative weights of the aggravating and mitigating factors without accurately stating the burdens of proof. He argued:

[I]f you find the aggravating do outweigh the mitigating, then the verdict is death. And if you find that the mitigating outweigh the aggravating or you can't agree, then the verdict is life imprisonment.

[Defense counsel] said she is not going to try to convince all of you. Well, the state has to convince all of you ...

Defense counsel objected to this as a misstatement of the law. The court replied: "Beyond a reasonable doubt. You left out beyond a reasonable doubt. Aggravating factors outweigh ..." The prosecutor then assured the court that he had not finished his sentence and told the jurors that the State had to convince all of them beyond a reasonable doubt. Later in the closing argument, the prosecutor asserted repeatedly that the mitigating factors did not outweigh the aggravating factors. Defense counsel asked the court to charge the jury that the prosecutor had misstated the law. The court agreed to instruct the jury very strongly that the aggravating factors must outweigh the mitigating factors. The court properly charged the jury with respect to the State's burden of proof and specifically instructed the jury that it must follow the court's instructions, accept and apply the law as stated by the court, and disregard counsel's statements regarding the law if they conflicted with the court's instructions.

Second, the prosecutor told the jury several times during summation that it had to decide the case without an appeal to its emotions and that the State could not make an emotional claim on behalf of the victim's family. Although defense counsel did not object to these remarks, the court nevertheless instructed the jury that it must "decide this case on the evidence without reference to conjecture and without any sympathy except such sympathy as any mitigating factor may inspire."

The prosecutor also inferred that he had personal knowledge of the relevant facts when he commented on one of defendant's mitigating factors under *N.J.S.A.* 2C:11–3c(5)(h), the catch-all

mitigating factor, that defendant's school system classified him as emotionally disturbed. The prosecutor asserted:

> I would suggest to you a lot of kids get that tag and they start these home study teams and Juvenile Intervention Bureau, and they have all kinds of things now to help kids get straightened out. So that they don't end up in a courtroom like this.

Finally, the prosecutor's comments on the physical abuse that defendant received as a child, comparing it to common corporal punishment, present perhaps the most troubling issue in the case.

> This Court has repeatedly expressed concern for "prosecutorial propriety. We have said time and again that 'because the prosecutor represents the government and people of the State, it is reasonable to say that jurors have confidence that he will fairly fulfill his duty to see that justice is done whether by conviction of the guilty or acquittal of the innocent.' His comments during opening and closing carry the full authority of the State. Hence, we cannot sit idly by and condone prosecutorial excesses."
>
> [*Frost, supra,* 158 *N.J.* at 87–88, 727 *A.*2d 1 (quoting *State v. Spano,* 64 *N.J.* 566, 568, 319 *A.*2d 217 (1974) (citations omitted)).]

Specifically, the prosecutor implied that his own childhood upbringing was not markedly different from defendant's childhood experiences. During summation, the prosecutor stated:

> I would suggest to you there should be no doubt in your mind that Mr. Papasavvas administered corporal punishment to his kids.
>
> I would guess that probably some of you, I mean it's not in vogue anymore since Dr. Spock hit the scene, but I would suggest some of us are probably old enough, I know I am, to remember corporal punishment. My mom had a switch. She would get one of those switches and I hopped to it right away. I didn't like those switches, and I got those switches a long time. And I had friends who father's got on them with belts and things.
>
> . . .
>
> Well, I've already suggested to you the corporal punishment, sure that should upset you and there is no question that kids get a lot of corporal punishment and had a little different attitude towards life than somebody [whose] parents never lay a hand on them. There is no question. My mother gave me that switch and I didn't like it, and it hurt. And I really didn't get that stopped until I was like thirteen years old. But the kids whose fathers whacked them more than my mom whacked me around, they were a little less apt to get in trouble than I was, usually because they didn't want to go home and get it from their old man. I mean I didn't want to go home and get that switch, but spare the rod, spoil the child, that book by Spock.

So, you know, that's there. But does that mean that this whole psyche or this, his, his whole psyche, or his whole life changed to the extent that it mitigates a whole lot what we are talking about here, the aggravating factors? I would suggest not.

There is a world of difference between a strict upbringing that the prosecutor experienced and an abusive upbringing in which a small child is chained to a post in the basement and beaten by his father.

## B.

The aggregate effect of the prosecutor's misconduct on defendant's ability to receive a fair trial in this case must be carefully considered.

The standard for reversal based upon prosecutorial misconduct is well-settled in the law. It requires an evaluation of the severity of the misconduct and its prejudicial effect on the defendant's right to a fair trial. We long have held that prosecutorial misconduct is not grounds for reversal of a criminal conviction unless the conduct was so egregious as to deprive defendant of a fair trial. The "fair trial" test applies to alleged prosecutorial misconduct in both the guilt, and penalty phases of a capital trial.

To justify reversal, the prosecutor's conduct must have been "clearly and unmistakably improper," and must have substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense. In determining whether the prosecutor's comments were sufficiently egregious to deny defendant a fair trial, we consider the tenor of the trial and the responsiveness of counsel and the court to the improprieties when they occurred. Specifically, the Court should consider "whether defense counsel made a timely and proper objection, whether the remark was withdrawn promptly, and whether the court ordered the remarks stricken from the record and instructed the jury to disregard them."

Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial. Failure to make a timely objection indicates that defense counsel did not believe the remarks were prejudicial at the time they were made. Failure to object also deprives the court of the opportunity to take curative action.

Even if defense counsel fails to object, "[a] prosecutor's remarks and actions must at all times be consistent with his or her duty to ensure that justice is achieved." Absolute adherence to this duty is stringently compelled in capital cases where the penalty is death.

[*Timmendequas, supra,* 161 *N.J.* at 575–76, 737 *A.*2d 55 (citations omitted).]

Although the Court considers especially offensive the prosecutor's allusions to his own upbringing, the comments were

not so prejudicial as to deny defendant a fair trial. Defense counsel did not object to the prosecutor's statements.

> Because defense counsel did not object to any of the prosecutor's opening remarks, or to many other remarks now claimed to constitute prosecutorial misconduct, defendant must demonstrate plain error to prevail. Plain error is "error possessing a clear capacity to bring about an unjust result and which substantially prejudiced the defendant's fundamental right to have the jury fairly evaluate the merits of his defense."
>
> [*Id.* at 576–77, 737 *A.*2d 55 (citations omitted).]

In addition, the prosecutor's comparison of corporal punishment to the abuse defendant received at the hands of his father was so untenable that it is improbable that any juror believed that the abuse defendant suffered was beneficial.

"After carefully examining the record and recognizing that some of the prosecutor's remarks were improper, nonetheless, we are fully satisfied 'that it was the weight of the evidence ... that led to this capital murder conviction rather than the prosecutor's improper comments." *Id.* at 596, 737 *A.*2d 55 (quoting *State v. Feaster*, 156 *N.J.* 1, 63–64, 716 *A.*2d 395 (1998)).

## V.

### *Other Issues*

For completeness of the record, we note and preserve defendant's challenge to the constitutionality of the Death Penalty Act and the proportionality of his death sentence. Defendant argues that the statute fails to define narrowly the class of death-eligible persons and fails to provide a system of meaningful appellate review. Defendant first asserts that since this Court's decision in *Ramseur, supra*, the Legislature and the Court have created new aggravating factors and broadened the scope of existing factors under the death-penalty statute, thereby rendering the statute unconstitutional. In addition, defendant contends that the system of appellate review has eroded, given that the Legislature has limited the right to proportionality review and the Court has affirmed death sentences even though finding numerous instances of trial error.

 We disagree with defendant's assertion that the recent amendments and interpretations of the death-penalty statute has rendered it unconstitutional. We continue to "hold that the Act is constitutional under the Eighth Amendment to the federal Constitution. We conclude, furthermore, that the Act is valid under [Article 1, paragraph 12 of] the New Jersey Constitution." *Ramseur, supra,* 106 *N.J.* at 190, 524 *A.*2d 188.

Because this appeal and other appeals that arose before our decision in *In re Proportionality Review Project,* 161 *N.J.* 71, 735 *A.*2d 528 (1999), proportionality review will take place in later proceedings. In the future, proportionality review will be consolidated rather than take place in a separate proceeding.

 Defendant also challenges the imposition of the noncapital sentences as illegal, excessive, and confusing. Defendant received five extended term sentences. Defendant argues, and the State agrees, that the imposition of extended terms on all counts was unlawful and that this Court should remand the case for resentencing of the noncapital counts. Pursuant to the pertinent sections of the extended-term statute, the extended term is discretionary, not mandatory, and does not apply to fourth-degree crimes. *State v. Martin,* 110 *N.J.* 10, 16, 538 *A.*2d 1229 (1988); *N.J.S.A.* 2C:44–5a(2). In addition, a court may impose only one extended term on one sentencing occasion. *State v. Pennington,* 154 *N.J.* 344, 360–61, 712 *A.*2d 1133 (1998); *N.J.S.A.* 2C:44–5a(2). Defendant's noncapital sentences are vacated and remanded for resentencing.

Defendant also challenges the consecutive features of the noncapital sentences. Specifically, defendant alleges that the court imposed the consecutive burglary sentence in violation of the guidelines set forth in *State v. Yarbough,* 100 *N.J.* 627, 643–44, 498 *A.*2d 1239 (1985). Defendant contends that the trial court could not have found that the capital murder and the burglary were crimes involving "separate acts of violence or threats of violence" or "were predominantly independent of each other," *id.* at 644, 498 *A.*2d 1239, because the jury found that the sole aggravating factor

used to impose the death penalty was the fact that the killing had taken place during the commission of a burglary and robbery.

Finally, defendant contends that the court failed to give a statement of the actual time defendant would have to serve before being eligible for parole on the non-capital counts and that there are inconsistencies between the sentencing transcripts and the judgment of conviction. These issues should be resolved at the required resentencing on the non-capital convictions.

## VI.

### The State's Cross–Appeal Claims

In a cross-appeal, the State challenged the trial court's refusal to permit it to introduce victim-impact evidence, and conversely its permission to defendant's family to plead for his life.[7] Defendant's counsel responded that they had "scrupulously avoided" introducing any evidence of defendant's character, therefore rendering the State's victim-impact testimony inadmissible. Instead, they claim that they simply presented testimony of how he was abused as a child and evidence of his mental and emotional disturbance, without asserting that he had a good character or a good record.

In capital sentencing each juror must individually determine whether each mitigating factor exists, and then individually decide whether the aggravating factors outweigh the mitigating factors beyond a reasonable doubt. *Bey II, supra,* 112 *N.J.* at 161, 548 *A.*2d 887. The death penalty is imposed only if the jurors unanimously agree that the aggravating factors outweigh the mitigating factors. *Ibid.* One mitigating factor, *N.J.S.A.* 2C:11–3c(5)(h), is defined as "[a]ny other factor which is relevant to the

---

[7] The State also challenges the trial court's ruling that precluded it from using the prior sexual assault (for which the police sought to arrest defendant) to establish the c(4)(f) escape-detection factor. That was a discretionary ruling based on a lack of any connection of that incident to Mrs. Place, a lack of notice, and the prejudicial effect of such evidence. We would not disturb that ruling.

defendant's character or record or to the circumstances of the offense." Essentially, section 5(h) is a catch-all factor of defendant's mitigating evidence not encompassed in the other defined factors. The victim-impact statute, *N.J.S.A.* 2C:11–3c(6), provides that if the defendant presents evidence of his character or record pursuant to section 5(h), the State may present evidence of the murder victim's character and background and of the impact of the murder on the victim's survivors. The statute then directs the trial court to inform the jury that if the jury finds that the State has proven at least one aggravating factor beyond a reasonable doubt and the jury finds evidence of a mitigating catch-all factor, then the jury may consider the victim impact evidence presented by the State in determining the appropriate weight to give the catch-all factor.

In *State v. Muhammad*, 145 *N.J.* 23, 678 *A.*2d 164 (1996), the Court upheld the constitutionality of the victim-impact statute and set forth procedures for its implementation.

As noted, the statute both authorizes and limits the use of victim-impact evidence. In this case, the evidence of defendant's background primarily related to his defense under mitigating factor c(5)(d) that his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired as a result of mental disease or defect. Although in other circumstances, generalized reference to a troubled childhood might be within the scope of c(5)(h), given the emphasis on the nature of defendant's condition as involving an organic brain defect, the trial court did not abuse it discretion in ruling that the victim-impact statute did not apply.

On the question of a brief plea for life, it was within the trial court's discretion to allow defendant's family members to make brief pleas for his life "[g]iven the impermissible inferences that might arise if a close relative did *not* plead for mercy while testifying." *Moore, supra,* 122 *N.J.* at 478–80, 585 *A.*2d 864; *see also, DiFrisco II, supra,* 137 *N.J.* at 506–07, 645 *A.*2d 734 ("Although we may not agree with the trial court's decision to prohibit

defendant's two siblings from asking the jury to have mercy on him, that decision was well within the bounds of the court's discretion").

## VII.

We affirm defendant's convictions. We also affirm his sentence of death. We remand the non-capital counts for resentencing.

LONG, J., dissenting.

This death sentence was imposed by a biased jury on tainted evidence. Because the majority holds otherwise, I dissent.

## I

Death-qualification at the guilt phase of this trial impermissibly interfered with Pappasavvas' right to an impartial jury. I recognize that this Court has concluded otherwise under the federal and state constitutions. *See State v. Hunt,* 115 *N.J.* 330, 355–56, 558 *A.*2d 1259 (1989); *State v. Bey,* 112 *N.J.* 123, 149–50, 548 *A.*2d 887 (1988) (*Bey II* ); *State v. Ramseur,* 106 *N.J.* 123, 248–54, 524 *A.*2d 188 (1987). I feel compelled to state my view that the right to an impartial jury is entitled to broader protection under *N.J. Const.* art. I, ¶ 9, than under its federal counterpart, and that the state doctrine of fundamental fairness requires the right to an impartial jury to be even more carefully safeguarded when a life is at stake. *Ramseur, supra,* 106 *N.J.* at 433–34, 524 *A.*2d 188 (Handler, J., dissenting); *State v. Gilmore,* 103 *N.J.* 508, 522, 511 *A.*2d 1150 (1986).

I am further satisfied that jurors generally favoring the death penalty are more punitive than excludable jurors; they are "less likely to consider mercy, more likely to favor harsh punishment as a means of reducing crime, and more likely to believe in the strict enforcement of all laws no matter what the consequences." *See* Robert Fitzgerald & Phoebe C. Ellsworth, *Due Process vs. Crime*

*Control: Death–Qualification and Jury Attitudes*, 8 *Law & Hum. Behav.* 31 (1984).[1]

[1] Relevant social science data supports those premises. *See, e.g.,* James Luginbuhl & Kathi Middendorf, *Death Penalty Beliefs and Jurors' Responses to Aggravating and Mitigating Circumstances in Capital Trials*, 12 *Law & Hum. Behav.* 263 (1988); Marilyn D. McShane et al., *Eligibility for Jury Service in Capital Trials: A Question of Potential Exclusion and Bias, Texas Bar J.,* April 1987, at 365; Michael L. Neises & Ronald C. Dillehay, *Death Qualification and Conviction Proneness: Witt and Witherspoon Compared,* 5 *Behav. Sci. & the L.* 479 (1987); Irwin A. Horowitz & David G. Seguin, *The Effects of Bifurcation and Death Qualification on Assignment of Penalty in Capital Crimes,* 16 *J. Applied Soc. Psychol.* 165 (1986); Gary Moran & John C. Comfort, *Neither "Tentative" nor "Fragmentary": Verdict Preference of Impaneled Felony Jurors as a Function of Attitude Toward Capital Punishment,* 71 *J. Applied Psychol.* 146 (1986); Rick Seltzer et al., *The Effect of Death Qualification on the Propensity of Jurors to Convict: The Maryland Example,* 29 *How. L.J.* 571 (1986); Claudia L. Cowan et al., *The Effects of Death Qualification on Jurors' Predisposition to Convict and on the Quality of Deliberation,* 8 *Law & Hum. Behav.* 53 (1984); Phoebe C. Ellsworth et al., *The Death–Qualified Jury and the Defense of Insanity,* 8 *Law & Hum. Behav.* 81 (1984); Craig Haney, *On the Selection of Capital Juries: The Biasing Effect of the Death–Qualification Process,* 8 *Law & Hum. Behav.* 121 (1984); Joseph B. Kadane, *After Hovey: A Note on Taking Account of the Automatic Death Penalty Jurors,* 8 *Law & Hum. Behav.* 115 (1984); David G. Seguin & Irwin A. Horowitz, *The Effects of "Death Qualification" on Juror and Jury Decisioning: An Analysis from Three Perspectives,* 8 *L. & Psychol. Rev.* 49 (1984); William C. Thompson et al., *Death Penalty Attitudes and Conviction Proneness: The Translation of Attitudes Into Verdicts,* 8 *L. & Hum. Behav.* 95 (1984); Louis Harris & Associates, Inc., *Study No. 814002* (1981); Edward J. Bronson, *Does the Exclusion of Scrupled Jurors in Capital Cases Make the Jury More Likely to Convict? Some Evidence from California,* 3 *Woodrow Wilson J.L.* 11 (1980); Phoebe C. Ellsworth et al., *The Effect of Capital Punishment Attitudes on Juror Perceptions of Witness Credibility* (1979)(unpublished); W. White, *The Constitutional Invalidity of Convictions, Imposed by Death–Qualified Juries,* 58 *Cornell L.Rev.* 1196 (1973) (citing L. Harris & Associates, Inc., *Study No. 2016* (1971)); George L. Jurow, *New Data on the Effect of a 'Death Qualified' Jury on the Guilt Determination Process,* 84 *Harv. L.Rev.* 567 (1971); Edward J. Bronson, *On the Conviction Proneness and Representativeness of the Death–Qualified Jury: An Empirical Study of Colorado Veniremen,* 42 *U. Colo. L.Rev.* 1 (1970); Fay J. Goldberg, *Toward Expansion of Witherspoon: Capital Scruples, Jury Bias, and the Use of Psychological Data to Raise Presumptions in the Law,* 5 *Harv. C.R.-C.L. L.Rev.* 53 (1970); Hans Zeisel, *Some Data on Juror Attitudes Toward Capital Punishment,* University of Chicago Law School: Center for Studies in Criminal Justice (1968); W. Cody Wilson, *Belief in Capital Punishment and Jury Performance,* University of Texas (1964)(unpublished).

Moreover, as explained by Justice Marshall, there is "overwhelming evidence that death qualified juries are substantially more likely to convict or to convict on more serious charges than juries on which unalterable opponents of capital punishment are permitted to serve." *Lockhart v. McCree*, 476 *U.S.* 162, 184, 106 *S.Ct.* 1758, 1771, 90 *L.Ed.*2d 137 (1986) (Marshall, J., dissenting). As one commentator observed: "From a social scientist's viewpoint the empirical question [whether death-qualified juries are biased against the defendant on the issue of guilt] has been conclusively answered." R. Seltzer et al., *The Effect of Death Qualification on the Propensity of Jurors to Convict: The Maryland Example*, 29 *How. L.J.* 571, 581 (1986); *see also People v. Fields*, 35 *Cal.*3d 329, 197 *Cal.Rptr.* 803, 673 *P.*2d 680, 709 (1983) (Bird, C.J., dissenting) ("When an individual is accused of a noncapital crime . . . the jurors who decide the question of guilt or innocence are drawn from virtually the entire population of fair and impartial, English-speaking adults in the community. However, when an individual's life hangs in the balance, the state alters that jury pool. Excluded for all purposes is any adult who would not vote for a death sentence even though that person could fairly decide the question of guilt or innocence.").

That empirical data is exacerbated by the troublesome fact that jurors excluded through death-qualification encompass a higher percentage of women and African–Americans than the remaining pool. *Fields, supra*, 197 *Cal.Rptr.* 803, 673 *P.*2d at 711–12 (Bird, C.J., dissenting); *see State v. Griffin*, 251 *Conn.* 671, 741 *A.*2d 913, 946 (1999) (Berdon, J., dissenting) ("[M]ore African–Americans and women are excluded because of their opposition to the death penalty despite their ability to serve impartially during the guilt phase."); *State v. Avery*, 299 *N.C.* 126, 261 *S.E.*2d 803, 814 (1980) (Exum, J., dissenting) (noting that opposition to capital punishment is "more pronounced" among women, non-whites, and college graduates; exclusion of those opposed to death penalty results in "systematic under-representation of black jurors").

Moreover, use of a death-qualified jury at the guilt phase "makes paramount the issue of the imposition of the death penalty itself, thus suggesting that the guilt of the defendant is a foregone conclusion.... One cannot read the transcript of a death-qualifying voir dire proceeding without a sense of impending doom." *Bey II, supra,* 112 *N.J.* at 192, 548 *A.*2d 887 (Handler, J., dissenting) (citing Craig Haney, *On the Selection of Capital Juries: The Biasing Effect of the Death–Qualification Process,* 8 *Law & Hum. Behav.* 121 (1984)). That combination of effects denies a capital defendant any hope that an impartial jury will decide his fate.

The only reason we have continued on the course of requiring death-qualification is the state's purported interest in the prosecutorial convenience of a single-jury bifurcated trial. The Court has rooted its position on that issue on the United States Supreme Court decision in *Lockhart, supra,* 476 *U.S.* at 162, 106 *S.Ct.* at 1758, 90 *L.Ed.*2d at 137. However, Justice Handler accurately distinguished *Lockhart* in *Ramseur, supra,* 106 *N.J.* at 432–33, 524 *A.*2d 188, and *Bey II, supra,* 112 *N.J.* at 191–95, 548 *A.*2d 887, as based on a different legislative scheme. Even if that were not the case, the truth is that the value of "prosecutorial convenience" is puny when weighed against a defendant's interest in an impartial jury and the fundamental fairness guarantees of our constitution.

At the very least, I would adopt the conclusions expressed by Justice O'Hern in *Ramseur, supra,* 106 *N.J.* at 333, 524 *A.*2d 188 (O'Hern, J., concurring), that death-qualification is inconsistent with New Jersey's traditional sense of fairness and justice, and is a subject requiring our intervention—if not constitutionally, then in the exercise of judicial supervision over our criminal justice system. We need to develop an alternative that will "vindicate both the state's interest in economical prosecution and a defendant's right to a jury that has not been informed before deliberating on his guilt of a crime that they may have to consider executing him for it." *Bey II, supra,* 112 *N.J.* at 198, 548 *A.*2d 887

(Handler, J., dissenting). That such alternatives are possible is clear.[2]

## II

The majority concedes that a series of errors occurred at Papasavvas' trial but characterizes them as harmless. In my view, the very notion of harmless error has no place in death penalty jurisprudence. Indeed, in *State v. Bey*, 112 *N.J.* 45, 106–19, 548 *A*.2d 846 (1988) (*Bey I* ) (Handler, J., concurring), Justice Handler discussed the need for an enhanced standard of appellate review in death penalty cases and rejected the contention that "harmless error" could be an adequate measure.

> Because the capital sentencing decision is intrinsically a moral, rather than exclusively an evidentiary decision, harmless error is an inadequate standard in the context of a capital murder prosecution. This insight applies with equal force ... to the jury's guilt-phase determinations ... because the guilt-phase record is routinely moved into evidence as the foundation of the penalty-phase judgment, any distinction between the two phases disintegrates. A capital case is a prosecutorial continuum in which evidence moves without interruption or alteration from the trial of guilt to the imposition of sentence. A guilt-phase determination in a capital case differs in kind, therefore, from a guilt determination in the normal criminal case. To avoid the confusion that could easily arise, I believe that harmless error should be eschewed as a substantive standard of appellate review of error in death penalty cases.
>
> [*Id.* at 115–16, 548 *A*.2d 846.]

---

2 *See* Donald P. Knudsen, Comment, *Inequities and Abuses of Death Qualification: Causes and Cures*, 32 *S.D.L.Rev.* 281, 292–98 (1987) (encouraging courts to seat separate death-qualified jury prior to guilt phase that will attend, but not participate, in guilt phase and then undertake sentencing if needed); Robert M. Berry, *Remedies to the Dilemma of Death Qualified Juries*, 8 *U. Ark Little Rock L.J.* 479, 501 (1986) (suggesting that courts seat entirely new death-qualified jury for penalty phase then use stipulated summaries of guilt phase); *see also Hunt, supra*, 115 *N.J.* at 396–402, 558 *A*.2d 1259 (Handler, J., dissenting) (advancing that courts empanel two juries to hear all evidence together, but excuse each during presentation of evidence or testimony that is irrelevant or inadmissible in trial for which it is responsible); *Fields, supra*, 197 *Cal.Rptr.* 803, 673 *P*.2d at 718–20 (Reynoso, J., dissenting) (advocating that, instead of two separate juries, courts empanel non death-qualified jurors for guilt phase but then replace those jurors with death-qualified alternates during sentencing); *State v. Young*, 853 *P*.2d 327, 394–95 (Utah 1993) (Durham, J., dissenting) (same).

See also *State v. Bey,* 137 *N.J.* 334, 414–18, 645 *A.*2d 685 (1994) (*Bey IV* ) (Handler, J., dissenting) (finding that harmless error standard fails to account for complex value judgments made by jury in penalty phase; "harmless-error rulings cannot properly account for the effect those errors might have on the subsequent determination of the defendant's sentence's proportionality"); *State v. Hightower,* 120 *N.J.* 378, 427, 577 *A.*2d 99 (1990) (*Hightower I* ) (Handler, J., concurring and dissenting) (insisting that error in capital-murder case cannot "be assimilated under a traditional assessment of its prejudice as measured against the totality of the evidence") (citations omitted).

Contrary to prior holdings of this Court, *see Bey I, supra,* 112 *N.J.* at 94–95, 548 *A.*2d 846 and *State v. Marshall,* 123 *N.J.* 1, 121, 586 *A.*2d 85 (1991) (*Marshall I* ), I would adopt a standard that would take into account both the moral considerations that pervade capital proceedings and the pragmatic vicissitudes of criminal justice administration.

> The State should be required to show beyond a reasonable doubt, where the error is not of constitutional dimensions, that there was no realistic likelihood of prejudice affecting the jury's deliberations arising from the error. Absent that demonstration, the error must lead to a reversal. Where the error is of constitutional dimension, however ... the substantive test must be further elevated.... The State shall be required to show that a constitutional error, whether arising in a pre-penalty phase of the prosecution or in the penalty phase itself, had "no effect" on the determination to impose the death sentence.
>
> [*Bey I, supra,* 112 *N.J.* at 116, 548 *A.*2d 846 (Handler, J., concurring.) ]

Such a review contemplates first, a heightened scrutiny of the record, and second, an in-depth assessment, under the heightened standard, of all errors presented on appeal. *Id.* at 117–18, 548 *A.*2d 846; *see State v. Koedatich,* 112 *N.J.* 225, 344, 548 *A.*2d 939 (1988) (*Koedatich I* ) (Handler, J., dissenting). The "heightened scrutiny of the record, acting in combination with the stringent standard for reversibility, eliminates less protective tests for determining reversible error, such as 'plain error' and 'harmless error.'" *Bey I, supra,* 112 *N.J.* at 118, 548 *A.*2d 846 (Handler, J., concurring). The benefit of that test is that

it requires the appellate court to see the case as a whole. Thus, each error identified in the Court's analysis of the record is critically evaluated in assessing prejudice both for its individual effect on deliberations and for its effect on the structure of the entire case.

*[Ibid.]*

*See also Marshall I, supra,* 123 *N.J.* at 253–56, 586 *A.*2d 85 (Handler, J., dissenting) (criticizing majority for using "divide and discount the errors" tactics and arguing for application of more enhanced standard of review to capital cases).

Although that standard places a heavy burden on the State, the nature of the death penalty, which leaves no room for the error tolerable in other cases, requires "a level of error-free process that is commensurate with the criminal sanction of death." *Bey I, supra,* 112 *N.J.* at 119, 548 *A.*2d 846 (Handler, J., concurring). The standard is "materially more protective, as a consequence of the severity of the penalty, than that applicable to the generality of criminal appeals." *Ibid.* In short, I would not engage in a harmless error analysis in a capital murder case. In any event, the errors that occurred at this trial were far from harmless.

### III

Jury selection is one of the most crucial stages of a capital trial. "The purpose of *voir dire* is to ensure an impartial jury and a fair trial." *State v. Timmendequas,* 161 *N.J.* 515, 599, 737 *A.*2d 55 (1999). In fact, "[t]he securing and preservation of an impartial jury goes to the very essence of a fair trial." *State v. Williams,* 93 *N.J.* 39, 60, 459 *A.*2d 641 (1983) (*Williams I* ); *see, e.g., State v. Czachor,* 82 *N.J.* 392, 401, 413 *A.*2d 593 (1980) (declaring that right to impartial jury is "fundamental"). "The courts in this State have recognized that under the State Constitution [article I, paragraph 10], the right of a defendant to be tried by an impartial jury is of exceptional significance." *Williams I, supra,* 93 *N.J.* at 60, 459 *A.*2d 641.

The fundamental right of trial by a fair and impartial jury is jealously guarded by the courts. The jury is an integral part of the court for the administration of justice and on elementary principles its verdict must be obedient to the court's

charge based solely on legal evidence produced before it and entirely free from the taint of extraneous considerations and influences.

[*Wright v. Bernstein*, 23 *N.J.* 284, 294–95, 129 *A.*2d 19 (1957).]

Thus, "the triers of fact must be as nearly impartial as the lot of humanity will admit." *Williams I, supra,* 93 *N.J.* at 60, 459 *A.*2d 641 (internal quotations omitted). This Court has "repeatedly stressed that the need for jury impartiality is heightened in cases in which the defendant faces death." *State v. Harris,* 156 *N.J.* 122, 162, 716 *A.*2d 458 (1998); *see also Williams I, supra,* 93 *N.J.* at 61–62, 459 *A.*2d 641 (concluding constitutional right to impartial jury "is entitled to the most zealous protection in the context of a criminal prosecution in which the defendant faces the death penalty").

## A.

The process of *voir dire* is not an entirely random one in which the trial court is free to invent a new methodology as each case arises. To be sure, tailoring is necessary but not out of whole cloth. There are fundamentals that have been established and that must be abided by in every case.

For example, the trial court must begin the *voir dire* in a capital case by outlining our death penalty law to the potential jurors. *See State v. Williams,* 113 *N.J.* 393, 412 n. 5, 550 *A.*2d 1172 (1988) (*Williams II* ).

Knowledge about what constitutes capital murder, the bifurcated proceeding that separates the guilt and penalty phases, and the use of the "aggravating and mitigating factors" scheme during sentencing will enable all potential jurors to answer questions concerning the death penalty free of misconceptions and faulty assumptions concerning how the law is administered in this state.

[*Ibid.*]

Giving prospective jurors an understandable definition of death-eligible murder is essential because "[i]n common parlance, murder and killing are interchangeable. Murder as used in the criminal-law system has a precise meaning, and capital murder is even more narrowly circumscribed." *State v. Biegenwald,* 126 *N.J.* 1, 42, 594 *A.*2d 172 (1991) (*Biegenwald IV* ).

In this case, the trial court neglected to define capital murder during *voir dire*. When giving initial instructions to the first of the two panels of the jury venire, the court said that the indictment charged Papasavvas with "purposeful" or "knowing" murder "by his own conduct," but did not further describe the meaning of those terms. When the second panel was called, the court did not even convey that much information. That panel was told only that Papasavvas was charged with death-eligible murder. In other words, the court did not define capital murder in laypersons' terms, or any other terms for that matter, to either panel of prospective jurors. Thus, the fundamental groundwork was not laid for further jurors' responses.

Consequently, those responses were tainted by impermissible "misconceptions and faulty assumptions concerning how the law is administered in this state." *Williams II, supra,* 113 *N.J.* at 412 n. 5, 550 *A.*2d 1172. Indeed, potential jurors gave answers that indicated their misunderstanding of the law with respect to the death-eligibility of particular classes of homicides. For instance, it was not uncommon for prospective jurors to say during *voir dire* that they believed that "accidental murder" should not result in a death sentence. Of course, inadvertent homicides are not death-eligible in New Jersey.

The court exacerbated the effects of its failure to define death-eligible murder by typically neglecting to follow up on venirepersons' responses with a clarification that would alleviate their misunderstandings. The following excerpt from the *voir dire* of Stella Policare is an example:

> THE COURT: Now, can you think of any cases where you would not impose the death penalty? That's an unfair question. That is a very difficult question. I don't know that—well, there may be someone.
>
> JUROR POLICARE: If someone accidentally murder—
>
> THE COURT: National news—huh?
>
> JUROR POLICARE: I'm sorry. If someone accidentally murdered someone.

At that point, the court moved on to another subject:

> THE COURT: Let me ask you this. Do you have any feelings at all, I don't care how vague they are or that you might be more apt to not impose the death penalty

because you feel some religious compunction, you have some religious belief that militates against it?

JUROR POLICARE: No.

As can be seen from that exchange, the notion of accidental murder was allowed to float unchallenged throughout the *voir dire* process. The court's questioning of Policare was typical. Out of the many potential jurors confused on that issue, it told only one that "there is no such thing as accidental murder." That error had the effect of allowing a potential juror to present himself or herself as open-minded on the death penalty when, in fact, the only crimes for which he or she would not impose the death penalty were not death-eligible in the first place.

As a result, prospective jurors may well have misapprehended our death penalty law without having their misapprehensions come to light. Potential jurors may have said, based on an honest belief, that they could consider sentencing Papasavvas to life imprisonment, when in fact, they only could consider a life sentence for homicides that are not actually death-eligible. Those prospective jurors, though appearing to be death-qualified, may not have been qualified to serve on a capital case.

### B.

The absence of an understandable definition of capital murder was not the only deficiency in the *voir dire*. We have held that when a defendant is charged with both sexual assault and capital murder, it is imperative that the trial court ask the prospective jurors whether they could consider mitigating evidence during the penalty phase even if they convicted defendant of such abhorrent crimes. *Biegenwald IV, supra*, 126 *N.J.* at 31, 594 *A.*2d 172. Asking that question is crucial because "the brutality of a rape and murder could blind venirepersons in the performance of their duties as jurors." *Ibid.* In *Williams II, supra*, 113 *N.J.* at 417, 550 *A.*2d 1172, we held that, "the failure to inquire into whether any juror could consider the mitigation evidence if it was established that defendant was guilty of rape and murder denied

counsel and the trial court the tools with which to insure that the jury panel could fairly undertake its role in this case." We further concluded that merely asking each venireperson whether the fact that the defendant was charged with murder, aggravated sexual assault, robbery, and burglary would influence his or her sentencing decision was inadequate. *Id.* at 416–17, 550 *A.*2d 1172.

Despite our clear pronouncements in those cases, the trial court here only occasionally asked venirepersons if they could be impartial and consider mitigating evidence during the penalty phase if they convicted Papasavvas of murder and aggravated sexual assault. Although defense counsel questioned several prospective jurors regarding their ability to be impartial if Papasavvas was convicted of those separate crimes in the guilt phase, neither the defense attorneys nor the prosecutor queried the majority of potential jurors on that issue. The court's questions to each prospective juror regarding whether he or she could be impartial despite the murder, aggravated sexual assault, and robbery charges against Papasavvas were not a sufficient substitute. The failure to question most prospective jurors regarding the particular impact of convictions for aggravated sexual assault and purposeful or knowing murder constitutes harmful error. *See Williams II, supra,* 113 *N.J.* at 417, 550 *A.*2d 1172.

### C.

In addition, I believe the trial court committed reversible error by denying Papasavvas' challenges for cause of three prospective jurors. Although Papasavvas peremptorily struck those jurors, the error was harmful because the jury that sat on Papasavvas' case was not impartial.

### 1.

The majority concedes that the trial court erred when it rejected Papasavvas' challenges of Bette Shampaner and Ira Leslie for cause. *Ante* at 584–85, 751 *A.*2d at 50. I agree that Shampaner and Leslie were not qualified and that Papasavvas should not have

been required to use peremptory challenges to strike them. Unlike the majority, I also believe that Harry Applegate was not qualified to serve on Papasavvas' jury.

During defense counsel's questioning, Applegate volunteered that, after due consideration, he was concerned about his ability to be impartial. The following exchange took place:

Q: Is there anything you think we haven't asked you yet that you think would be important to us deciding whether or not you were going to sit on the jury?

A: One of the questions I thought about after leaving here last Tuesday, and I answered the questions on the survey as truthfully as I thought it was at the time simply because I didn't relate it to my circumstance, and that was the age of the victim or age of someone being sixty-four. That's right at my mother's age. I don't know whether I can draw a clear line between the two. I think I would wind up, although I wouldn't tend to, associate some of that.

Q: Let me ask you this. Are you fearful that might somewhat impair your ability to be impartial in the case? I'm not asking you to predict the future, but sitting here now, do you think that's a real possibility?

A: I can't guarantee it wouldn't be. I think it could be.

. . . .

Q: I just ask you in all candor, can you tell us now you think probably that's going to impact on the way you feel about things when you decide the case? I'm just asking for a candid response. I know you can't predict the future, but don't you think that may impact upon the way you see the case?

A: I think it, I believe it could possibly, yes, especially if, as one of the questions in the survey said, there's photos of the victim or crime scene photos, I think I would relate her to it.

Q: And that would be to Mr. Papasavvas' detriment you think?

A: Probably.

Thus, four times Applegate reiterated his concern over his impartiality.

The prosecutor then expressed his incredulity at Applegate's avowed position and attempted to get him to retract:

Q: You said obviously because of your mother you would relate to this. *Are you telling us* you realize from what the judge said that the state has to present evidence that convinces you beyond a reasonable doubt as to the defendant's guilt or there isn't any case, so *are you telling us* because of your mother, you would sit here and because the victim might be that age and you may see pictures, *are you telling us* even though the state didn't present enough proof to convict this defendant, you would convict him anyway just because he's accused of a crime involving an old woman?

Applegate recognized the clarion call for a negative response, and answered "no," but immediately returned to his original misgivings about his impartiality:

A. I would think I would be able to fairly judge, but I think that, I don't think I would be able to put that relationship clearly out.

Q. Okay. You can't forget your life experience and the fact that you have a mother somewhat the age of the victim.

A. Right.

Q. But you would be able to fairly judge in spite of your human experience?

A: I would think so.

Over Papasavvas' objection, the court qualified Applegate.

The trial court must dismiss prospective jurors whose views on capital punishment would prevent or substantially impair the performance of their duties to follow the trial court's instructions and obey the oath. *State v. Simon,* 161 *N.J.* 416, 465, 737 *A.*2d 1 (1999). Conversely, a trial court should death-qualify potential jurors who would not be prevented or substantially impaired by their beliefs from performing their deliberative duties. *See Ramseur, supra,* 106 *N.J.* at 249, 524 *A.*2d 188.

The court must excuse potential jurors who say that they would automatically impose a death sentence if the defendant is convicted of capital murder, *Williams II, supra,* 113 *N.J.* at 438–41, 550 *A.*2d 1172, or who find it almost impossible to vote for life imprisonment, *Bey II,* 112 *N.J.* at 154, 548 *A.*2d 887. In addition, venirepersons who will not consider and weigh mitigating evidence must be excluded for cause. *Morgan v. Illinois,* 504 *U.S.* 719, 729, 736, 112 *S.Ct.* 2222, 2229–30, 2233–34, 119 *L.Ed.*2d 492, 502–03, 507 (1992). Furthermore, the court must excuse a prospective juror with prejudices based on the age of the victim. *See Timmendequas, supra,* 161 *N.J.* at 601, 737 *A.*2d 55 (approving disqualification of potential jurors who indicated biases based on victim's age); *cf. State v. Marshall,* 148 *N.J.* 89, 333, 690 *A.*2d 1 (1997) (*Marshall III* )(Handler, J., dissenting) (noting *voir dire* must ensure jury not biased because of victim's status).

Applegate's expressed identification with the victim Mrs. Place, based on the similarity between her age and that of his mother,

reiterated five separate times, substantially impaired his ability to perform his duties as a juror. His comments regarding his bias based on the victim's age were not fleeting; he raised the issue of the victim's age himself and had thought about his potential prejudice for several days. It obviously troubled him. His answers to the prosecutor's questions simply did not establish his impartiality. The prosecutor's questioning "seemed calculated to draw out only such answers as would rehabilitate [him] as a juror," *Williams II, supra,* 113 *N.J.* at 439, 550 *A.*2d 1172, and that was impermissible.

Moreover, Applegate never categorically stated that he could be impartial. In his most forceful assertion of his impartiality, dragged out of him by the prosecutor, he answered "I would think so." Applegate raised clear and unequivocal reservations about his own bias based on the victim's age five separate times; he did not, by stating that he "would think" he could fairly judge the evidence in the case, demonstrate that he was qualified to serve on Papasavvas' jury. Like Shampaner and Leslie, who the majority acknowledges were improperly seated, Applegate was not "as nearly impartial as the lot of humanity will admit." *Williams I, supra,* 93 *N.J.* at 60–61, 459 *A.*2d 641 (internal quotations omitted).

### 2.

We recently stated that the

erroneous failure to remove a juror for cause is reversible error if the defendant shows "(1) that the trial court erred by failing to remove a juror for cause; (2) that the juror in question was eliminated by the exercise of defendant's peremptory challenge and that defendant exhausted his peremptory challenges; and (3) at least one of the remaining jurors that sat on the jury was a partial juror."

[*State v. Simon,* 161 *N.J.* 416, 466, 737 *A.*2d 1 (1999) (quoting *State v. DiFrisco,* 137 *N.J.* 434, 471, 645 *A.*2d 734 (1994) (*DiFrisco II* ), *cert. denied, DiFrisco v. New Jersey,* 516 *U.S.* 1129, 116 *S.Ct.* 949, 133 *L.Ed.*2d 873 (1996)).]

A defendant, of course, has a constitutional right to an impartial jury. *See State v. Harvey,* 151 *N.J.* 117, 210, 699 *A.*2d 596 (1997) (*Harvey II* ). The presence of a partial juror obviously violates that right. *DiFrisco II, supra,* 137 *N.J.* at 470–71, 645 *A.*2d 734.

A necessary corollary is that the seating of a juror who is essentially an unknown quantity also violates defendant's right to an impartial jury.

Because the trial court erred in failing to remove Shampaner, Leslie and Applegate for cause, and because Papasavvas indisputably exhausted his peremptory challenges, his death sentence cannot be upheld unless an impartial jury sat on his case. In my opinion, the jury that decided Papasavvas' fate was not impartial and, thus, his sentence must be vacated.

The *voir dire* of Shilpaben Patel, one of the twelve jurors who convicted Papasavvas and sentenced him to die, failed to establish that she was impartial. Patel had answered the jury questionnaire prior to the *voir dire* and expressed bias. The court asked her about her written response:

Q: Now, you stated in the questionnaire, that the fact the victim was 64 years of age, might or would impair your ability to be a fair juror? Is there any reason why that would impair your ability to be a fair juror?

She answered:

A: I don't know.

The following colloquy ensued:

Q: No?

A: I don't know.

Q: Might that have been a mistake?

A: It could be.

Q: Is there anything about the age that bothers you?

A: I don't know.

Q: You don't know?

A: I don't know.

Instead of pursuing that evasion, the court ceased questioning altogether about Patel's attitudes pertaining to the victim's age. No one else pursued that area.

Ultimately, the subject changed when one of the defense attorneys followed up on the court's *voir dire:*

Q: Well, if you heard evidence, that Peter suffered brain damage, as a result of a bad motor vehicle accident, and that part of his brain, that controls behavior, was

damaged, would that be the kind of mitigating information, that might lead you to impose the life in prison as opposed to the execution?

A: I cannot decide right now.

Q: Would you consider it? Would you listen to the testimony regarding the mental damage?

A: Uh-hum.

Q: And then consider it, think about it? Or would you just dismiss it out of hand, and say, I don't care, I don't want to hear any of those mental defect reasons? His conduct led to the death of this woman, he should be put to death?

A: I have to listen. But I cannot just answer right away. I will think, you know.

Q: And consider the information that comes to you at that phase of the trial?

A: Uh-hum.

The other defense attorney subsequently supplemented his colleague's questioning:

Q: If we get to the penalty phase ... the jury will have found he committed both the murder and the sexual assault of a 64–year–old woman, in her home, while he was in her home with no business being there.

Would that be the type of case where you might, if you made that finding, feel that death was definitely the appropriate punishment for such an individual.

A: I don't know. I have to think. I cannot say right now what to do.

Despite Patel's repeated evasive and noncommittal answers, the trial court qualified her.

It is important to understand that Patel's "I don't know" answers to the questions regarding her attitudes about the victim's age do not indicate that she was impartial. Significantly, she never disavowed her answer in the questionnaire that directly stated that the victim's age would impair her ability to be impartial. *See Harris, supra,* 156 *N.J.* at 164, 716 *A.*2d 458 (excusing for cause prospective jurors who, on questionnaire, responded they were unsure if race would impact their verdict). Rather, when asked if that answer was a mistake, Patel replied, "It could be." Her ambiguous answers regarding her biases based on the victim's age left counsel and the trial court unable to evaluate Patel's fitness to serve on the jury.

Patel gave additional problematic equivocal answers during her *voir dire.* When defense counsel asked her if evidence that Papasavvas suffered brain damage that affected the part of his

brain that controls behavior might lead her to impose a life sentence, she answered, "I cannot decide right now." After she said she would listen to the mitigating evidence, defense counsel asked if she would dismiss that evidence out of hand and sentence Papasavvas to death. She reiterated that she would listen to the evidence and replied, "But I cannot just answer right away." When the other defense attorney asked Patel if she felt that death was definitely the appropriate punishment for the alleged crime, Patel responded, "I don't know. I have to think. I cannot say right now what to do."

The majority concludes that Patel's answers indicate her open-mindedness. *Ante* at 598, 751 *A.*2d at 58. Not so. Defense counsel asked Patel whether she was capable of imposing a life sentence, not whether she would do so. It is only the latter question to which, "I cannot decide right now" would have been an appropriate answer. *See Witherspoon v. Illinois*, 391 *U.S.* 510, 522 n. 21, 88 *S.Ct.* 1770, 1777 n. 21, 20 *L.Ed.*2d 776, 785 n. 21 (1968) ("[A] prospective juror cannot be expected to say in advance of trial whether he would in fact vote for the extreme penalty in the case before him."). Defense counsel, however, asked Patel if she had an open mind—whether she might sentence Papasavvas to life imprisonment. In order to be qualified to serve on a capital case, a prospective juror must answer that question in the affirmative. Being able and willing to consider fairly both a life sentence and a death sentence is a prerequisite for death-qualification. *See Williams II, supra,* 113 *N.J.* at 438–42, 550 *A.*2d 1172. By stating that she could not decide whether Papasavvas' mitigating evidence might lead her to vote for a life sentence, Patel did not demonstrate her qualifications to serve on Papasavvas' jury. Although she said that she would listen to and consider Papasavvas' mitigating evidence in the abstract, she never stated whether she had the capacity to sentence Papasavvas to life imprisonment or whether she would sentence him to death regardless of the mitigating evidence.

Thus, there is no evidence that Patel was an impartial juror. *See Williams II, supra,* 113 *N.J.* at 422, 550 *A.*2d 1172 ("Despite the deference normally accorded the trial court in assessing the demeanor and responses of potential jurors, our reading of this admittedly cold record leaves us no choice but to find that insufficient information was elicited from [juror] to evaluate properly his fitness to serve. Our conclusion does not constitute second-guessing of the trial court's determination, based on [juror's] credibility, that the juror was 'forthright, direct and clear,' but rather constitutes a finding that the substance of the elicited information ... left both counsel and the trial court unable to evaluate [juror's] fitness to serve on the jury." (citation omitted)). Indeed, because of the equivocal nature of Patel's responses, the situation was no different from one in which the court simply plucked a juror out of the array and allowed him or her to sit without inquiry. As that is interdicted, so is this.

Because the trial court erroneously rejected Papasavvas' for-cause challenges of three prospective jurors who were not death-qualified, Papasavvas exhausted his peremptory challenges; consequently, a juror who was not shown to be impartial sentenced him to death. Thus, I believe Papasavvas' death sentence must be reversed. *See Biegenwald IV, supra,* 126 *N.J.* at 43, 594 *A.*2d 172 (mandating reversal of death sentence when jury may have included biased jurors).

3.

The trial court improperly denied Papasavvas two peremptory challenges by granting an extra challenge to the State without proportionally increasing the number of his challenges. In murder cases, "the defendant shall be entitled to 20 peremptory challenges ... and the State shall have 12 peremptory challenges.... The trial judge shall have the discretionary authority to increase proportionally the number of peremptory challenges available to the defendant and the State." *R.* 1:8–3(d). When the court used its discretionary authority to give the State an extra

peremptory strike, it became obliged to grant Papasavvas two additional peremptory challenges.[3] It erred by not providing Papasavvas with any supplemental strikes.[4] The majority concedes that error. However, it concludes that Papasavvas was not prejudiced by the denial of his motion for an additional peremptory challenge. *Ante* at 604–05, 751 *A.*2d at 61. I disagree.

Although "a peremptory challenge is not a fundamental constitutional right," *DiFrisco II, supra,* 137 *N.J.* at 479, 645 *A.*2d 734, the court's error in denying Papasavvas the challenges to which he was entitled cannot be harmless. Papasavvas exhausted his peremptory challenges and juror Patel sat on the jury though she had failed to establish her impartiality during the *voir dire.* Under the three-part test this Court enunciated in *DiFrisco II,* Papasavvas' death sentence must be reversed. *Id.* at 471, 645 *A.*2d 734.

The majority supposes that the trial court would have granted Papasavvas an additional peremptory challenge if he had "shown" that he needed it. I am not confident that the trial court, that obviously, though erroneously, thought jurors Applegate, Shampaner, and Leslie were qualified, would have had reason to grant Papasavvas' request for an additional peremptory challenge. Moreover, the majority misses the point when it suggests that the trial court would have granted another peremptory strike if defense "counsel had an abiding concern about the need." *Ante* at 604, 751 *A.*2d at 61. Once the trial court granted the State an extra strike, Papasavvas had an absolute right to two additional peremptory challenges and by conditioning the grant on a showing

---

[3] In a murder case, for every extra strike given to the State, the court must give the defendant an additional challenges. *R.* 1:8–3(d). Thus, the court should have rounded-up the fraction and provided Papasavvas with two more peremptory strikes.

[4] Although defense counsel told the court at the conclusion of the striking process that the jury was satisfactory, he preserved that claim for appellate review by objecting to the court granting an extra peremptory challenge to the State and requesting an additional peremptory challenge, which was denied.

of need, the court infringed that right. Although *Rule* 1:8–3(d) requires that a defendant receive twenty and the State twelve strikes, in reality Papasavvas had seventeen and State had thirteen challenges.

The majority underestimates the prejudicial impact of the trial court's error. The bottom line is that Papasavvas did not have an impartial jury to determine his cause. Had the court given Papasavvas the two additional peremptory challenges to which he was undoubtedly entitled, he could have struck Patel from the jury.

## IV

The last witness to appear at trial was Dr. Stanley Portnow, a psychiatrist who also holds a law degree. He was called to rebut evidence that Papasavvas was legally insane and suffered from a diminished capacity when he killed Mrs. Place. Much of Portnow's testimony, which is set forth in some detail in the majority opinion, *ante.* at 610–13, 751 A.2d at 64–67, was inadmissible and overall it sufficiently prejudiced Papasavvas' case so as to require a new trial.

In order to appreciate how pernicious Portnow's testimony was, the exact nature of Papasavvas' defense must be recalled. Papasavvas claimed that when he tried to render Mrs. Place unconscious by putting her in a "sleeper hold," she passed out and accidentally fell down the cellar stairs, breaking her neck. Thereafter, because Papasavvas thought Mrs. Place might be feigning death, he gagged her with a belt. Still unsure of whether Mrs. Place was pretending, Papasavvas took preparatory steps threatening to sexually assault her, hoping to trick her into acknowledging that she was awake. As slim a reed as that might have been, it was Papasavvas' only factual defense. In addition, the defense presented expert testimony regarding Papasavvas' severe organic brain damage, that (it claimed) rendered him incapable of acting purposefully or knowingly in his encounter with Mrs. Place; it also presented evidence of legal insanity.

Portnow's rambling monologue improperly attacked those defenses. He was allowed to assert again and again *not* that Papasavvas had the capacity to act purposefully or knowingly, which was the point of his testimony and which would have been proper, but that Papasavvas actually *had* acted purposefully the night that Mrs. Place died. Portnow was allowed to declare that he did not believe that Papasavvas had been abused as a child. He was allowed to attack Papasavvas' overall credibility. Most egregious, he was allowed to attribute unsubstantiated but highly incriminating thoughts to Papasavvas.

As a psychiatric expert, Portnow's role was to contribute a scientific opinion on whether Papasavvas was capable of forming the necessary mental state (purposeful or knowing) for capital murder, or whether he had a mental condition that prevented him from understanding the nature of his acts or distinguishing between right and wrong. Portnow fulfilled that role by stating that Papasavvas did not suffer from diminished capacity to form purpose or intent, or from any type of mental condition that would deprive him of the capacity to know or appreciate the nature of his acts or to know that they were wrong.

He did not stop there, however, but proceeded to inject into the case his own personal opinions about what happened the night Mrs. Place died. Before Portnow took the stand, defense counsel asked the court to preclude him from repeating a statement that he had included in his report to the prosecutor that said:

When the deceased happened upon him and he realized that she would call the police, he killed her and sexually assaulted her before stealing her credit cards and car keys.

Defense counsel argued that that was an improper opinion on the ultimate issues of Papasavvas' guilt or innocence. The trial court overruled the objection but directed the prosecutor to rein in Portnow. Instead, Portnow was allowed to launch into a discourse including the objected to portion of his report verbatim; he prefaced it with his opinion that "Mr. Papasavvas knew exactly what he was doing."

It was for the jurors—not Portnow—to decide, based on the competing evidence concerning his mental capacity, whether Papasavvas "knew exactly what he was doing" when he killed Mrs. Place, that is, whether he killed her purposefully or knowingly. Instead, cloaked in expert garb, Portnow was allowed to proffer those ultimate opinions himself.

For example, when Portnow summarized the events of the night Mrs. Place was killed, he presumed to tell the jury exactly what was going on in Papasavvas' mind at each stage of the events. Although some of his testimony reflected information learned from his interview with Papasavvas, other portions were at odds with that information. For example, he said that Papasavvas cut Mrs. Place's clothes with the "express purpose" of engaging in a sexual act with her. Moreover, he did not testify merely that Pappasavvas had the capacity to act purposefully, but that he indeed acted that way:

This was a thought, goal-directed action . . . . there was nothing impulsive.

Portnow then put words into Papasavvas' mouth

The woman can identify me, *I'll* put her in a sleeper hold, *throw her down the steps if she is not already dead.* This is not an organic impulsive acting out. People who have organic damage are still capable of premeditating crime, just like schizophrenics.

Amazingly, Portnow then added his own philosophy of criminal responsibility to the mix:

Just because you're schizophrenic doesn't mean you have the right to go out and kill someone and the type of activities as I have it recorded here.

At that point, defense counsel objected to Portnow giving a speech that was not responsive to any pending question. The court, who said that it had been "waiting" for counsel to object to the testimony, told the jurors not that Portnow's testimony was outrageously beyond his capacity or expertise, but that it was their job, not Portnow's, to decide if Papasavvas was guilty:

Let me stop you for a minute now that I have an objection.

Ladies and gentlemen of the jury, I've got to tell you something. I've been listening to this doctor now for the last five minutes tell us that this gentlemen is guilty of everything he's charged with. That is not his job. That is your job. You are here, you've heard all of the evidence. You've heard all of the testimony and

you're going to decide whether this gentleman is guilty of any of the crimes charged, not this doctor. That is not his job. He can tell us about psychiatric, state of mind, cognitive functions. That's what he's an expert on. But he's not here to tell us that Papasavvas is guilty of anything. That's what you're going to decide. And I want to make sure that your realize that because sometimes we are led by an expert's opinion. If the expert believes so, it must be so. No. It will be your job to determine whether he's guilty of any of these charges.

After Portnow testified, defense counsel moved for a mistrial that was denied. Alternatively, he moved to have the jury disregard all of Portnow's testimony except for portions that the defense might use in summation. Noting that Portnow was a lawyer as well as a medical doctor, counsel argued that the court could fairly presume that he knew that he was exceeding the bounds. That was also denied.

Portnow questioned Papasavvas' credibility, both directly and indirectly, and repeatedly stated that Papasavvas had acted purposefully when he killed Mrs. Place; he plainly conveyed that he did not believe Papasavvas' account of events. He also represented that Papasavvas had killed Mrs. Place to make sure she "never" reported him to the police, and that he threw her down the stairs to make sure she was dead—intentions that Papasavvas never acknowledged having.

Insinuating that Papasavvas lied when he gave him his background information, Portnow questioned Papasavvas' credibility by suggesting that he had not been abused as a child. Noting that Papasavvas did not report having suffered "any broken bones or welts," Portnow volunteered that the "discipline" imposed on him could not have been very severe because Papasavvas had continued to act out. I note that that testimony underscored the prosecutor's denigration of Papasavvas' past abuse that the majority recognizes as "especially offensive." *Ante* at 625, 751 *A*.2d at 74.

Portnow also strayed far beyond proper bounds of expert testimony by presuming to tell the jury—purportedly as a psychiatric expert—exactly what Pappasavvas was thinking at each stage of the fatal incident. First, he put Mrs. Place into a sleeper hold, because he "just wanted to be sure that she never reported

him to the police." Second, he "decided" to throw her down the stairs to kill her if she was not already dead from strangulation:

> This was a thought, goal-directed action. This was, there was nothing, in other words there was nothing impulsive. The woman can identify me, I'll put her in a sleeper hold, thrown her down the steps if she is not already dead.

Those assertions had no basis whatsoever in either the records that Portnow had reviewed or his interviews with Papasavvas. Papasavvas said nothing of the sort. Yet, in the guise of expert opinion with its overlay of importance, Portnow was allowed to put into Papasavvas' mouth highly incriminating statements that the trial court left totally unchecked.

In short, Portnow's testimony broke several fundamental rules governing expert evidence. The role of an expert witness is to contribute the insight of his speciality. *In re Hyett*, 61 *N.J.* 518, 533, 296 *A*.2d 306 (1972). In that capacity, he "should distinguish between what he knows as an expert and what he may believe as a layman." *Ibid.* He is not the ultimate trier of fact; that is the role of the jury. Moreover, "it is impermissible for 'an expert's opinion [to be] expressed in such a way as to emphasize that the expert believes the defendant is guilty of the crime charged under the statute.'" *State v. Sharpless*, 314 *N.J.Super.* 440, 455, 715 *A*.2d 333 (App.Div.1998) (quoting *State v. Odom*, 116 *N.J.* 65, 80, 560 *A*.2d 1198 (1989) (alteration in original)).

Portnow breached those principles by communicating his improper conclusion that Papasavvas had acted purposefully on the given night, and by directly and indirectly commenting on Papasavvas' credibility and the defense theory—both of which were issues for the jury to decide. "It is not a medical function to weigh the truth of assertions or statements." *Hyett, supra*, 61 *N.J.* at 533, 296 *A*.2d 306. Rather, credibility is "an issue which is peculiarly within the jury's ken," and a subject on which jurors ordinarily do not need expert help. *State v. Jamerson*, 153 *N.J.* 318, 341, 708 *A*.2d 1183 (1998) (quoting *State v. J.Q.*, 252 *N.J.Super.* 11, 39, 599 *A*.2d 172 (App.Div.1991), *aff'd*, 130 *N.J.* 554, 617 *A*.2d 1196 (1993)). In addition, there is no scientific basis "for the conclusion that a psychologist ... has some particular ability to

ferret out truthful from deceitful testimony." *J.Q., supra,* 252 *N.J.Super.* at 40, 599 *A.*2d 172.

The majority concludes that the court's instructions were appropriate remedial measures. *Ante* at 614, 751 *A.*2d at 67. I disagree. The first instruction, which the court gave toward the end of Portnow's testimony, simply told the jurors that they were to determine if the Papasavvas was guilty and that Portnow was not "here to tell us if Pappasavvas is guilty of anything." The second instruction, which the court gave at the end of the guilt phase, was essentially the same. It told the jury that "some" of Portnow's testimony "seemed to indicate his opinion regarding the guilt or innocence of the accused," that it improperly did so, and that the jurors should disregard his opinion of Papasavvas' guilt or innocence "unless you find from the totality of the evidence that you can accept from other facts that you can draw the same inferences and reach the same conclusion."

Those instructions were deficient in several critical respects. First, they did not address Portnow's improper comments and insinuations about Papasavvas' credibility. Second, they did not explain that Portnow's limited role was to determine whether Papasavvas was capable of forming the requisite intent for capital murder, not whether he indeed formed that intent. Third, the instructions did not distinguish those portions of Portnow's testimony that were proper from those that were not. Fourth, they did not tell the jury to ignore Portnow's statements that attributed thoughts or intentions to Papasavvas on that particular night. Fifth, and most important, the purported curative instructions omitted the only point that could possibly have ameliorated the devastating effect of Portnow's testimony—a clear and unequivocal statement that, in testifying, Portnow had arrogated to himself powers that he did not have, expressed "expert opinions" on subjects over which he had absolutely no expertise, and was no more able to determine Papasavvas' truthfulness or to imagine his thoughts than they were. Only that kind of an instruction could deflate the power of Portnow's "expert status." It was simply

inadequate to tell the jurors to ignore his conclusions. That was like ignoring the proverbial elephant in the courtroom.

Portnow's improper testimony essentially gave the lie to Papasavvas' entire defense. Its potential effect on the jury was enormous and that effect was not ameliorated by the court's instructions.

## V

Besides having the potential to skew the guilt phase of the trial, Portnow's improper testimony had a spill-over effect on the penalty phase by supporting a crucial aggravating factor and undercutting several mitigating factors. *See State v. Erazo*, 126 *N.J.* 112, 132, 594 *A.*2d 232 (1991).

His representation that Papasavvas had "decided" to kill Mrs. Place to make sure she never reported him to the police supported a finding that Papasavvas had killed her to avoid detection; in fact, five jurors found that factor. They were, however, not told to disregard that factor because of their lack of unanimity. *See State v. Muhammad*, 145 *N.J.* 23, 52, 678 *A.*2d 164 (1996) (noting that jurors must be unanimous in finding existence of aggravating factor and they must adhere to trial court's limiting instruction and deliberate about appropriate sentence without consideration of those aggravating factors that were not unanimous); *DiFrisco II, supra*, 137 *N.J.* at 489, 645 *A.*2d 734 ("[T]he death-penalty statute require[s] a unanimous jury finding to establish the existence of an aggravating factor.").

Portnow's unsolicited and speculative opinion that Papasavvas was not really physically abused as a child militated against the jurors finding that Papasavvas' emotional disturbance was due to that abuse, and indeed, five jurors found that mitigating factor inapplicable. Further, his attributions of intentional behavior to Papasavvas on the night Mrs. Place died and his claim that Pappasavvas "knew exactly what he was doing" militated against finding that Pappasavvas was under the influence of an extreme emotional disturbance. Nine jurors rejected that factor.

To exacerbate matters, when the court instructed the jury at the sentencing phase, it gave no instruction at all on Portnow's testimony. It merely said that the jurors could consider evidence presented at both phases of the trial and that the jurors could not base an aggravating factor on any "histories" that the experts obtained from the Papasavvas. Moreover, the court did not remind the jurors to disregard Portnow's opinion that Papasavvas had killed Mrs. Place to escape apprehension.

Portnow's comments and the court's silence had the clear capacity to affect the outcome of the sentencing phase and, in all likelihood, did so to Papasavvas' detriment.

## VI

For his crime against Mrs. Place, Peter Pappasavvas has been sentenced to die. The jury that made that determination was death-qualified and thus predisposed towards a guilty verdict and a death sentence. The majority concedes that numerous errors occurred during Pappasavvas' trial, but concludes that those errors were harmless. Harmless error is not an appropriate standard in a capital murder case. In any event, the errors that occurred in this case were not harmless but crushing to Papasavvas' defense.

The trial court erroneously qualified three jurors; Papasavvas was forced to exhaust his peremptory challenges to remedy that error; he was not given the two extra challenges due him; as a result, a juror not shown to be impartial sat on the jury. Further, the trial court improperly permitted Portnow, the State's "expert" witness, to comment on Papasavvas' credibility; to state, not that Papasavvas had the capacity to form the requisite mental state for murder, but that he actually did so; to read his mind; and to put highly incriminating words into his mouth. Thereafter, the court gave an impotent curative instruction that lacked the power to ameliorate Portnow's excesses. Portnow infected not only the guilt phase but the penalty phase. Accordingly, I would reverse Papasavvas' conviction and death sentence.

For *affirmance and remandment*—Chief Justice PORITZ and Justices O'HERN, GARIBALDI, STEIN, COLEMAN and VERNIERO—6.

For *reversal*—Justice LONG—1.